UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PATRICIA MIODUSZEWSKI, Derivatively on Behalf of Nominal Defendant, UNDER ARMOUR, INC., c/o Bragar Eagel & Squire, P.C. 885 Third Avenue, Suite 3040 New York, New York 10022<br><br>Plaintiff,<br><br>v.<br><br>KEVIN PLANK, c/o Under Armour, Inc. 1020 Hull Street Baltimore, Maryland 21230<br><br>DOUGLAS E. COLTHARP, c/o Under Armour, Inc. 1020 Hull Street Baltimore, Maryland 21230<br><br>and<br><br>A.B. KRONGARD, c/o Under Armour, Inc. 1020 Hull Street Baltimore, Maryland 21230<br><br>Defendants,<br><br>and<br><br>UNDER ARMOUR, INC., c/o Under Armour, Inc. 1020 Hull Street Baltimore, Maryland 21230<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Patricia Mioduszewski ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Under Armour, Inc. ("UA" or the "Company"), against its Chief Executive Officer ("CEO") and controlling stockholder, defendant Kevin Plank ("Plank"), and two members of the Audit Committee of UA's Board of Directors (the "Board"), defendants Douglas E. Coltharp ("Coltharp") and A.B. Krongard ("Krongard"), seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment. All facts relating to Plaintiff and her own acts are pleaded on personal knowledge, while other facts are pleaded upon information and belief as follows:

## SUMMARY OF THE ACTION

1.      UA is one of the largest athletic apparel brands in the world, with a current market capitalization of approximately $6.75 billion.   The Company is headquartered in Baltimore, Maryland, where it was founded in 1996 by its CEO and controlling stockholder, defendant Plank.

2.      UA went public in 2005.   Thereafter, Plank became a billionaire due to the Company's success.   As his wealth increased, Plank expanded his business endeavors in and around Baltimore.   Among other things, he currently owns a hotel, a horse farm, a distillery, and a real estate firm called Sagamore Development Co. ("Sagamore").

3.      Although his business interests were expanding beyond UA, Plank managed to maintain full voting control of the Company through his exclusive ownership of UA Class B shares.   Under the Company's governing documents, the Class B shares owned by Plank receive ten votes per share, while the Company's Class A shares, held by the public, receive one vote per share.   Due to this arrangement, at all relevant times Plank controlled approximately 65% of the Company's stockholder voting power.   As a result of his two-thirds control of the

Company's stockholder votes, Plank alone is able to elect directors for additional terms on the Board, or, by voting against them, remove directors from the Board.

4.      In approximately 2012, Plank's real estate firm, Sagamore, began purchasing land in Baltimore's Port Covington waterfront district.   Port Covington is situated on the Middle Branch of the Patapsco River and functioned as a railroad terminal for most of the twentieth century.   Port operations ended in the 1970s and the site was abandoned in 1988.

5.      In September 2014, the Audit Committee, including defendants Coltharp and Krongard, approved UA's entrance into a lease with Sagamore for office space in Port Covington, for occupancy beginning in early 2016.

6.      In early 2015, local news reports revealed that Plank, through Sagamore, had purchased approximately 120 acres of land in Port Covington and was planning a multi-billion-dollar development project for the defunct railroad terminal.   Plank's proposed development would be a mixed-use community anchored by a major new UA campus that would eventually have over 13 million square feet of offices, homes, stores, and restaurants.

7.      In January 2016, Sagamore kicked off a series of public presentations aimed at obtaining hundreds of millions of dollars in public financing, tax incentives, and private investment for the Port Covington project.   These presentations repeatedly and pervasively cited UA's commitment to locate its new headquarters in the development as the "anchor" that would attract other businesses and lead to billions of dollars in new development in the next 20 years.

8.      In March 2016, Sagamore and Plank received approval by the Baltimore Development Corp. for a record $535 million in public financing for the Port Covington project. Sagamore's presentations in support of this public financing repeatedly relied on UA's long-term

commitment to anchor the Port Covington development as demonstrating the viability of the project and justifying their request for the funds.

9.      Throughout the first half of 2016, Sagamore and Plank repeatedly told the public and state and local governments that UA would be the long-term anchor in the development project, and, through these representations, ultimately became eligible for over $760 million in city and state property tax credits over the life of the project.

10.     In September 2016, the Baltimore City Council gave final approval to a $660 million financing package to Plank and Sagamore for the Port Covington project.  Public reports indicate that Plank stands to make billions of dollars off of the development.

11.     In April 2017, the Board disclosed that during the previous year, the Audit Committee, including defendants Coltharp and Krongard, had approved related-party transactions with entities owned by Plank worth over $73 million.   In addition to $2.4 million paid to lease aircraft owned by Plank, these transactions included the Company's purchase of a piece of land in the proposed Port Covington development for $70.3 million in June 2016.

12.     According to reports in the press, Sagamore had purchased the same parcel of land in 2014 for approximately $35 million.   Due to Plank's enormous apparent profit on this land transaction, the overall amount of related-party transactions between UA and Plank in 2016, and Plank's control of the Board, Plaintiff inferred that the transactions may not have been at arm's-length.

13.     In May 2017, Plaintiff served a litigation demand pursuant to Maryland law on UA's Board demanding that the Board investigate whether breaches of fiduciary duties and other wrongdoing had occurred in connection with the related-party transactions described herein (the "Demand").

14.     In a document sent to Plaintiff approximately six months later, the Board refused the Demand due primarily to its conclusions that:   (i) Plank had not benefited from the real estate transaction with UA and (ii) the Audit Committee had conducted thorough oversight of the transaction and found it to be at arm's-length.

15.     The Board's response to the Demand did not follow the process required by Maryland law, and it failed to convene an independent committee to respond to the Demand, even though Plank exercised complete control over the election and removal of all directors. The Board's process in responding to the Demand was unreasonable and not in good faith as detailed fully below.   In particular, the Board produced no evidence to support its reasoning or conclusions.

16.     The failure to produce evidence demonstrating its reasoning and conclusions is particularly indicative of bad faith and unreasonableness here, because the Board's substantive conclusions conflict with the well-established public record.

17.     The public record demonstrates that by January 2016, Plank had decided that UA would move to the Port Covington development and would be the long-term anchor of the project.   But, in denying the Demand, the Board claimed that in early 2016, the Audit Committee was considering where to move or expand the Company's headquarters and was considering different proposals.

18.     In its refusal of the Demand, the Board claimed that the Audit Committee did not approve UA's purchase of the Port Covington parcel until June 2016.   This assertion is contradicted by the public record which shows that beginning six months earlier, Plank and Sagamore were seeking, and ultimately obtained, over half a billion dollars in public financing

on the basis of Plank's representations that UA would be the anchor of the project over the next 20 years.

19.     Similarly, the Board concluded that breach of fiduciary duty claims against Plank and the Audit Committee members would not succeed on the merits because Plank "made no money" on the sale of the Port Covington parcel to UA.   However, Plank used UA's commitment to anchor the development to attract at least hundreds of millions, if not billions, of dollars in public and private investment to his development project.   All told, he will profit to the tune of billions of dollars from the Port Covington project, and the project itself would not have been possible without UA as the anchor of the development.   Accordingly, the conclusion that Plank did not benefit from the transaction is unreasonable and in bad faith.

20.     The Board concluded that Plank did not usurp a corporate opportunity because he presented the purchase of the Port Covington parcel to the Board prior to purchasing it himself. This conclusion relied on an unreasonable, narrow review of the facts at issue and therefore was not in good faith.   The public record demonstrates that Plank and Sagamore obtained hundreds of millions of dollars in public financial and tax incentives due to UA's agreement to anchor the Port Covington project.   According to UA's public filings, none of the tax incentives or public financing accrued to UA.   Had UA's purchase of the Port Covington land been at arm's-length, UA could realistically expect to obtain and/or benefit from at least some portion of the government financing and tax incentives.

21.     In sum, the Board failed to document its procedure, reasoning, and conclusions in refusing the Demand.   Because the conclusions contradict publicly known facts, the Board's investigation was unreasonable and in bad faith.   For these reasons, and those detailed below,

Plaintiff's Demand was wrongfully refused and Plaintiff should be permitted to maintain this action on behalf of UA and its absent stockholders.

22.      This action seeks to recoup losses UA has already sustained and will continue to sustain in connection with the wrongdoing alleged herein.

## JURISDICTION AND VENUE

23.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.   This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

24.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of Maryland, or an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

25.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because during the wrongdoing alleged herein, UA maintained its principal place of business in this District, one or more of the individual defendants resides in or maintains an office in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

26.      Plaintiff currently owns 401 shares of UA common stock, and has held shares of UA common stock continuously since prior to the revelations of wrongdoing alleged herein. Plaintiff is a citizen of New Jersey.

**Nominal Defendant**

27.     UA is a publicly-traded company organized under Maryland law.   The Company maintains its corporate headquarters at 1020 Hull Street Baltimore, Maryland 21230.   UA manufactures and sells athletic apparel.   UA stock trades on the New York Stock Exchange under the symbol "UA."    UA is a citizen of Maryland.

**Individual Defendants**

28.     Defendant Plank is the founder, controlling stockholder, Chairman of the Board, and CEO of UA.   Plank is a citizen of Maryland.

29.     Defendant Coltharp has served as a director of UA since December 2004. Coltharp was a member of the Audit Committee during 2016 and 2017, and approved the Port Covington real estate transaction as well as the other improper transactions described herein. Upon information and belief, Coltharp is a citizen of Alabama.

30.     Defendant Krongard has served as a director of UA since July 2005.   Krongard was a member of the Audit Committee during 2016 and 2017, and approved the Port Covington real estate transaction as well as the improper transactions described herein.   Upon information and belief, Krongard is a citizen of Maryland.

31.     Defendants Plank, Coltharp, and Krongard are referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

32.     Anthony W. Deering ("Deering") served as a director of UA from August 2008 until, upon information and belief, his death in November 2017.   Deering was a member of the Audit Committee during 2016 and 2017, and approved the Port Covington real estate transaction as well as the improper transactions described herein.

33.    George W. Bodenheimer ("Bodenheimer") has served as director of UA since August 2014, and was a member of the "review group" that recommended the Board refuse the Demand.    Bodenheimer also voted to refuse the Demand.

34.    Eric T. Olson ("Olson") has served as a director of UA since July 2012, and was a member of the "review group" that recommended the Board refuse the Demand.    Olson also voted to refuse the Demand.

35.    Jerri L. DeVard ("DeVard") has served as a director of UA since May 2017, and voted refuse the Demand.

36.    Karen W. Katz ("Katz") has served as a director of UA since October 2014, and voted to refuse the Demand.

37.    William R. McDermott ("McDermott") has served as a director of UA since July 2005, and voted to refuse the Demand.

38.    Harvey L. Sanders ("Sanders") has served as a director of UA since November 2012, and voted to refuse the Demand.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers, directors, and/or fiduciaries of UA, and because of their ability to control the business and corporate affairs of UA, the Individual Defendants owed UA and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage UA in a fair, just, honest, and equitable manner.    The Individual Defendants were required to act in furtherance of the best interests of UA and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interests or benefit.    Each director and officer of the Company owed to UA and its stockholders a fiduciary duty to exercise good faith and diligence in the

administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of UA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with UA, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

41.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, as well as all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith to ensure that the Company's communications with the public and with stockholders were made with due candor in a timely and complete fashion; and

d.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

42.     UA's principal business activities are the development, marketing, and distribution of branded performance apparel, footwear, and accessories for men, women, and children.

43.     At all relevant times, UA's principal executive offices have been located at 1020 Hull Street, Baltimore, Maryland.   The Hull Street offices are located in an area of Baltimore known as Locust Point.

44.     On December 22, 2014, *The Baltimore Sun* published an article reporting on major real estate transactions in Baltimore's Port Covington waterfront district.   One of the transactions described in the article was the purchase of a "59-acre shopping center with a Wal-Mart and a now-closed Sam's Club, which sold in January [2014] for $35 million" to defendant Plank's Sagamore entity.   This $35 million parcel was, upon information and belief, the parcel that UA ultimately purchased for $70 million in 2016.

45.     On March 2, 2015, *The Baltimore Sun* published an article titled "Port Covington land is space for Under Armour to grow," which reported that:

> Under Armour CEO Kevin Plank said Monday that he wants to create a new neighborhood on the waterfront acreage he has assembed [sic] in Port Covington, anchored by a relocated Under Armour headquarters and enlivened by shopping, restaurants, a distillery and horse stables.
>
> *                 *                 *
>
> Plank said he wants to build a mixed-use community on the waterfront that combines an Under Armour campus with other elements that would draw people to the area.   If approved, the Sagamore Spirits distillery would be open for tours and have a restaurant.
>
> *                 *                 *
>
> Plank has assembled more than 120 acres in Port Covington, a former industrial area once largely controlled by the CSX railroad and its predecessors.   In the 1980s, the city targeted the area for redevelopment as The Baltimore Sun

relocated its presses there, but little development followed until 2002 when Wal-Mart and Sam's Club opened stores there.

*       *       *

Baltimore Development Corp. President Bill Cole . . . said he expects Plank will have an easier time with his plans to grow in Port Covington than in a crowded residential and industrial area like Locust Point.

"The Port Covington site itself is a much more appealing area because it has far fewer complicating factors," said Cole, who represented Locust Point as a city councilman before taking the BDC job.   "It's a blank slate for the most part."

46.     On July 13, 2015, UA's Board issued a definitive proxy statement soliciting stockholder votes at a special meeting of stockholders to be held on August 26, 2015 (the 2015 Proxy Statement").   In the 2015 Proxy Statement, the Board recommended that stockholders vote for a number of proposals designed to ensure Plank's control of the Company.   Plank controlled sufficient shares to guarantee passage of the proposals.   According to the 2015 Proxy Statement, a Board committee composed of defendants Krongard, Coltharp, and non-party Deering, and advised by Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") had recommended the changes.

47.     On July 31, 2015, an article in *The Baltimore Sun* reported that Plank had amassed "at least 148 acres in Port Covington."

48.     On January 7, 2016, *The Baltimore Sun* reported that Plank's real estate firm "presented plans to the city to transform the [Port Covington] area with a major mixed-use waterfront development costing billions of dollars over the next 20 years."   As reported in the article, Plank and Sagamore had staked the success of their multi-billion-dollar development on the presence of UA to anchor the project.   Repeatedly, Plank and his associates publicly presented UA's agreement to anchor the development as proof of the viability of the project and

as support for their requests for hundreds of millions of dollars in financial support from federal, state, and local governments.   According to the article:

> Anchored by an Under Armour campus where empty parking lots now surround a Wal-Mart, Sagamore Development's project would establish a new neighborhood and skyline with up to 13 million square feet of offices, homes, stores and restaurants, and a shore remade with parks and running paths.

> "We've been waiting a long time to start revealing some of the exciting development plans and ideas that we have for Port Covington," said Marc Weller, Sagamore Development's president.

> \*       \*       \*

> Sagamore, which owns about 160 acres in Port Covington, expects to spend at least a year getting the master plan approved.   The firm intends to seek financial support from the federal, state and local governments but has not submitted any formal proposals, Weller said.

> \*       \*       \*

> The plan calls for a new Under Armour headquarters campus clustered on about 50 acres that now contain a Wal-Mart and former Sam's Club that Sagamore started converting into offices for the growing Baltimore-based sports apparel brand last year.

> \*       \*       \*

> "Port Covington is going to be the future home of the Under Armour global headquarters, and that's the key ingredient," [Caroline Paff, a vice president at Sagamore] said.   "That's what was missing from those other proposals.   That's the driver of how this is going to happen."

> \*       \*       \*

> "It will be wait-and-see, but having Under Armour as an anchor for a development is a pretty good start," said [David] Gillece, [who heads the Baltimore office of Cushman & Wakefield and worked on plans for Port Covington for a city economic development agency in the late 1980s] who has not seen the master plan

49.    On January 9, 2016, *The Baltimore Sun* published an article containing an interview with Marc Weller ("Weller"), Sagamore's president and Plank's business partner. The article reported that Weller "made the first public presentation to the city this week, kicking

off a process expected to lead to billions of dollars in new development in the next 20 years.

Anchored by a new headquarters campus for Under Armour, the Port Covington project would

transform the peninsula."

50.    On February 22, 2016, the Board caused the Company to file with the SEC its

Form 10-K for the 2015 fiscal year.    The Form 10-K, which was signed by the Board, including

defendants Plank, Coltharp, and Krongard, disclosed the following in the section of the Form

10-K titled "Risk Factors":

> **Kevin Plank, our Chairman and Chief Executive Officer controls the
> majority of the voting power of our common stock**
>
> Our Class A common stock has one vote per share and our Class B common stock
> has 10 votes per share. Our Chairman and Chief Executive Officer, Kevin A.
> Plank, beneficially owns all outstanding shares of Class B common stock.   As a
> result, Mr. Plank has the majority voting control and is able to direct the election
> of all of the members of our Board of Directors and other matters we submit to a
> vote of our stockholders.    The Class B common stock automatically converts to
> Class A common stock when Mr. Plank beneficially owns less than 15.0% of the
> total number of shares of Class A and Class B common stock outstanding and in
> other limited circumstances.    This concentration of voting control may have
> various effects including, but not limited to, delaying or preventing a change of
> control or allowing us to take action that the majority of our shareholders do not
> otherwise support.    In addition, if our Class C common stock is issued, the Class
> C common stock will carry no voting rights (except in limited circumstances), and
> the continued issuance of the Class C common stock in future stock-based
> acquisition transactions or to fund employee equity incentive programs, could
> prolong the duration of Mr. Plank's voting control.

51.    On March 11, 2016, the Board, including defendants Plank, Coltharp, and

Krongard, caused the Company to issue a definitive proxy statement ("2016 Proxy Statement")

soliciting stockholder votes to elect each of the Individual Defendants to an additional term as a

director.    According to the 2016 Proxy Statement, only holders of Class A and Class B common

stock as of the record date, February 26, 2016, were entitled to vote.    On the record date, there

were 183,001,283 shares of Class A common stock and 34,450,000 shares of Class B common

stock outstanding.    Each share of Class A common stock was entitled to one vote and each class

of Class B common stock was entitled to ten votes, and the holders of both classes would vote together as a single class on all matters.   Accordingly, the holders of Class B common stock controlled approximately 340 million votes and the holders of Class A common stock controlled approximately 182 million votes.   The 2016 Proxy Statement disclosed that as of the record date, Plank owned all 34,450,000 outstanding shares of Class B common stock, representing 65.3% of the voting shares.   Plank therefore controlled the outcome of the stockholder vote.

52.   Regarding the nomination of directors, the Board maintained no mechanism for the holders of Class A common stock to elect even a single director to the Board independent of Plank.   According to the 2016 Proxy Statement, none of the directors were nominated by unaffiliated minority stockholders, and the Board "does not have a specific written policy or process regarding the nominations of directors."

53.   Regarding director compensation, the 2016 Proxy Statement disclosed that each of the directors other than Plank, including defendants Coltharp and Krongard, received between $200,000 and $255,000 in director fees during the previous year.   During 2015, Plank was compensated approximately $2.4 million and was granted a restricted stock award with the fair value of $5 million.

54.   Regarding related-party transactions, the 2016 Proxy Statement disclosed:

A company owned by Kevin Plank owns a jet aircraft.   We have an operating lease agreement with the company to lease the aircraft when it is used by Kevin Plank or other persons for our business purposes.   In 2015, we paid a fixed monthly lease payment of $166,667, or $2.0 million.   We determined that the lease payment rates are at the fair market value lease rate for this aircraft based on a third party appraisal.   The Audit Committee determined these lease terms were reasonable and that we would benefit by the use of the aircraft for company business.

In addition, in 2014 we entered into a lease agreement with an entity controlled by Kevin Plank to lease office space located near our principal offices in Baltimore in order to expand our corporate headquarters to accommodate our growth needs. The lease has a 10 year term beginning in 2016.   Lease payments began in

January 2016 at $1.1 million annually with an annual escalation of 2.0% thereafter for approximately 130,000 square feet. Following a third party appraisal, we determined the lease payments were at fair market lease rates. We also determined that the location of the property as well as other favorable terms of the lease, such as renewal options and the right to occupy approximately 40,000 square feet of additional space without increased lease payments, provided us with overall terms that were both fair and reasonable to us and provided flexibility otherwise unavailable at alternative locations.

In 2015 we also entered into a lease with an entity controlled by Kevin Plank to lease industrial space located near our principal offices in Baltimore, which we plan to use as an innovation and manufacturing testing facility and other business purposes. The lease covers 68,000 square feet and has a five year term, with payments beginning in May 2016. The annual lease rate is currently $510,000, with the annual lease rate escalating 2.5% each year. Following an independent market rent appraisal, we determined that the lease payments were at fair market lease rates. We also determined that the location of the property as well as other favorable terms of the lease, such as renewal options and flexibility regarding the design of the space, provide us with overall terms that were both fair and reasonable to us and provided flexibility otherwise unavailable at alternative locations.

55. The 2016 Proxy Statement described the Board's policy for review of related-party transactions as follows:

*Policies and Procedures for Review and Approval of Transactions with Related Persons*

Our Corporate Governance Guidelines require that any transaction involving Under Armour and a director or executive officer or entities controlled by a director or executive officer, be approved by our Board of Directors. The Board has delegated to the Audit Committee oversight and approval of these and other matters that may present conflicts of interest. The committee has adopted a formal written policy on transactions with related persons. Related persons are generally defined under SEC rules as our directors, executive officers, or stockholders owning at least five percent of our outstanding shares, or immediate family members of any of the foregoing. The policy provides that the committee shall review and approve or ratify transactions with related persons and any material changes to such transactions. The policy further provides that in determining whether to approve or ratify such a transaction, the committee may consider the following factors:

- whether the terms of the transaction are reasonable and fair to Under Armour and on the same basis as would apply if the transaction did not involve a related person;

- whether the transaction would impair the independence of a non-management director; and

- whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the committee deems relevant.

56.     On March 19, 2016, *The Baltimore Sun* published an article titled "T. Rowe Price takes stand against stock structures that create unequal shareholder rights," which reported that in the upcoming proxy season, T. Rowe Price Group, Inc. would oppose certain directors and members of governance committees "at companies controlled by insiders via a dual-class stock structure."    According to the article:

> Under Armour, the Baltimore-based athletic apparel brand, has had such a structure concentrating voting power in the hands of its founder and CEO Kevin Plank, but soon will issue a new class of nonvoting stock in a stock split to preserve his control over the company even as he sells shares.
>
> Preserving control for founders is often cited as the reason for creating such multi-class stock structures as companies grow and the founders' ownership or voting power becomes diluted.   Plank called it a "founder-led approach."   But that leaves shareholders with unequal voting rights, say critics, who see such structures as founders seeking access to the capital of a public company while keeping the control of a private company.
>
> "We believe this structure is problematic and not in the best interest of our fund shareholders," said Bill Benintende, a T. Rowe spokesman.   "The message we are trying to send is that the best governance structure is one in which controlling stockholders share the same link between economic risk and control as other stockholders."
>
> *        *        *
>
> T. Rowe has adopted the policy even as, across the Inner Harbor, Under Armour prepares to complete a stock split that would give each of its shareholders a share of a new nonvoting stock for each share of common stock they own, further diluting their voting rights, while preserving Plank's control.
>
> The company already operates under a dual-tier stock structure in which Plank owns most of the Class B shares, which have 10 times the voting rights of Class A shares.

At the meeting last August at which shareholders approved the unusual new split, Plank argued it maintained what he called his "founder-led approach" to corporate governance that has resulted in soaring sales, profits and stock value for a decade at the company.

Under the new plan, should Plank's ownership dip below 15 percent, all his Class B shares would convert to Class A shares, effectively ending Under Armour's unequal voting structure.   But that could be years from now.   Plank owns 15.9 percent of the company's outstanding stock but controls 65.3 percent of the voting shares, according to the company's latest proxy statement

57.     On March 24, 2016, *The Baltimore Sun* published an article reporting that:

The Baltimore Development Corp.'s board unanimously approved a record $535 million in public financing to build infrastructure for billionaire Under Armour founder Kevin Plank's mixed-use real estate project in Port Covington, sending the proposal to the city's Board of Finance for review.

The money would build streets, utilities, sewers, bike and pedestrian paths, and other infrastructure on the South Baltimore peninsula, where Plank plans to develop thousands of residences and millions of square feet of office and retail space alongside a new headquarters campus for his sports apparel company.

The request from Plank's private real estate firm, Sagamore Development, still needs approval from the Board of Finance and the City Council.   Sagamore also is seeking about $574 million in state and federal funds for transportation infrastructure in the area, which is located in an Enterprise Zone and eligible for significant tax breaks.

*        *        *

[Baltimore Development Corp. President William H. Cole IV] said he was not sure what specific infrastructure the first round of bonds would fund, but none of the $535 million would go to improvements inside the Under Armour campus. The city is focused on "core" needs, and the project will be subject to additional review, including evidence that developer has the finances to move forward with the proposed buildings, he said.

"We, the city, are not going to be issuing bonds for a project that can't demonstrate its capacity to be built and be successful. It's just not going to happen," he said.   "There will be a careful analysis of each and every phase before bonds are issued."

58.     On March 28, 2016, *The Baltimore Sun* published an article reporting:

A record $535 million in city financing to help billionaire Kevin Plank redevelop Port Covington could face tough questions from members of the city's Board of Finance.

The financing would be used to build infrastructure in Port Covington, where Under Armour's founder is planning a massive redevelopment anchored by a campus for his sports apparel company.   It needs to be approved by the board and the full City Council.

"There's a perception from my end, and probably the public's end, that we're creating projects that are making people very wealthy, and these people are already extremely wealthy," board member Larry I. Silverstein.   "So we should just make sure that we're not being taken advantage of."

\*       \*       \*

In addition to the city's $535 million, Sagamore is seeking about $574 million in federal and state funding for transportation projects for the area, where they want to create a new Light Rail spur and new highway access.

\*       \*       \*

Board members also expressed skepticism about relying on Under Armour to spur millions of square feet of new development, including 7,500 new residences, many of them rental.   The project is expected to generate an average of $34 million in annual tax revenue for the city, with much of the revenue coming in later years.

59.     On April 19, 2016, *The Baltimore Sun* reported that Sagamore "will be exempt from city requirements to include affordable housing in the proposed multibillion-dollar redevelopment of Port Covington, but the firm agreed to make some residences available below market rate."

60.     On April 22, 2016, *The Baltimore Sun* reported that "[t]he Port Covington redevelopment planned by Under Armour CEO Kevin Plank is expected to be eligible for a total of $760.4 million in city and state property tax credits over the life of the project, according to an analysis the city released Friday."   The article reported that the financing would cost the city $2.16 billion over 41 years, and that "Sagamore owns about 160 acres in Port Covington.   The firm plans to serve as master developer, working with partners to complete 15 million square feet in new construction, including an Under Armour headquarters, residences, offices, shopping and hotel rooms."

61.     On May 2, 2016, the Board caused the Company to file with the SEC a Form 8-K disclosing that Plank had elected himself and defendants Coltharp and Krongard, as well as non-party directors Deering, Adams, Katz, Bodenheimer, McDermott, Olson, and Sanders to new terms as directors.

62.     On May 9, 2016, *The Baltimore Sun* reported that the city Board of Finance had approved $550 million in financing for the Port Covington project.   The article also reported that "Sagamore, which controls about 160 acres in Port Covington, has proposed redeveloping the area with new offices, stores, residences and parks, anchored by a new headquarters for Under Armour."

63.     On September 17, 2016, *The Baltimore Sun* published an article reporting that Sagamore had been purchasing land in Port Covington since at least 2012, and that the Baltimore City Council "is poised to give final approval to $660 million in bonds that would pay for public infrastructure in Port Covington, where Sagamore plans restaurants, shops, housing and manufacturing space."   The article also reported that the location of UA's headquarters in Port Covington had long been preordained by Plank as early as 2008, but was intentionally concealed from the public:

> Eager to stay in Baltimore, Under Armour officials printed out aerial maps of the city to look for open space.
>
> "It became incredibly obvious Port Covington was ripe for development," Weller said.
>
> Said [Tom] Geddes [CEO of Sagamore parent company Plank Industries]:   "Kevin was really attracted to the idea there was no risk of displacing people from their homes."
>
> But to make the plan work, they needed to move quickly and quietly, the developers said. If sellers believed the properties were needed for an Under Armour campus, they likely would jack up the price, Weller said.
>
> "The use of names and addresses that didn't tie back to Kevin was all very intentional," Weller said.   "We wanted to be successful in acquiring as much as possible as quickly as possible."

Companies discreetly owned by Plank purchased his first Port Covington property at a foreclosure auction.   A Plank-owned whiskey distillery is now under construction on that site.   His second purchase, 101 W. Dickman St., reopened last year as the City Garage incubator and event space.   The third, a roughly $35 million deal revealed in January 2014 that included a Walmart and a former Sam's Club building, made it clear that someone was assembling property in the area.

Later that year, a Plank entity bought a 60-acre property there that includes the site of The Baltimore Sun's printing plant from the newspaper's former parent, Tribune Media, for $46.5 million, more than twice the $21 million it was valued for tax purposes.   The Sun has a long-term lease for the property.

64.     On September 19, 2016, *The Baltimore Sun* reported that "[t]he Baltimore City Council gave its final approval Monday to a $660 million financing package for Under Armour CEO Kevin Plank's massive Port Covington project — a deal supporters say will bring thousands of jobs to Baltimore, but critics say is corporate welfare."

65.     On February 23, 2017, the Board caused the Company to file with the SEC its Form 10-K for the 2016 fiscal year.   The Form 10-K was signed by defendants Plank, Coltharp, and Krongard, as well as non-party directors Deering, Adams, Bodenheimer, Katz, McDermott, Olson, and Sanders, and disclosed the following in the section of the Form 10-K titled "Risk Factors":

**Kevin Plank, our Chairman and Chief Executive Officer controls the majority of the voting power of our common stock.**

Our Class A common stock has one vote per share, our Class B common stock has 10 votes per share and our Class C common stock has no voting rights (except in limited circumstances).   Our Chairman and Chief Executive Officer, Kevin A. Plank, beneficially owns all outstanding shares of Class B common stock.   As a result, Mr. Plank has the majority voting control and is able to direct the election of all of the members of our Board of Directors and other matters we submit to a vote of our stockholders.   The Class B common stock automatically converts to Class A common stock when Mr. Plank beneficially owns less than 15.0% of the total number of shares of Class A and Class B common stock outstanding and in other limited circumstances.   This concentration of voting control may have various effects including, but not limited to, delaying or preventing a change of control or allowing us to take action that the majority of our shareholders do not otherwise support.   In addition, we utilize shares of our Class C common stock to fund employee equity incentive programs and may do so in connection with

future stock-based acquisition transactions, which could prolong the duration of Mr. Plank's voting control.

66.     On April 13, 2017, the Board, including defendants Plank, Coltharp, and Krongard, caused the Company to issue a definitive proxy statement ("2017 Proxy Statement") soliciting stockholder votes to elect each of them and a new director nominee, non-party DeVard. The 2017 Proxy Statement disclosed that during 2016, the Audit Committee was comprised of defendants Coltharp and Krongard, as well as non-party director Deering.

67.     According to the 2017 Proxy Statement, the voting rights of Class A and Class B common stock were the same as those disclosed previously.   On the record date, March 17, 2017, there were 184,667,304 shares of Class A common stock and 34,450,000 shares of Class B common stock outstanding.   The 2017 Proxy Statement further disclosed that as of the record date, Plank owned all 34,450,000 outstanding shares of Class B common stock, representing 65.1% of the voting shares.   Plank therefore again controlled the outcome of the stockholder vote.

68.     With respect to Board leadership structure, the 2017 Proxy Statement disclosed that:

> During 2016, we implemented a series of changes to our stock and corporate governance that resulted in the creation of our Class C Stock.   On April 7, 2016, stockholders of record of our Class A Stock and Class B Stock received shares of Class C Stock on a one-for-one basis.   Among other things, these changes permit us to issue Class C Stock instead of Class A Stock through our equity incentive plans without further diluting the voting control of Mr. Plank, thereby prolonging our current governance structure, which we believe is important to our long-term growth and success.

69.     According to the 2017 Proxy Statement, the Board maintained no mechanism for the holders of Class A common stock to elect even a single director to the Board independent of Plank.   According to the 2017 Proxy Statement, none of the directors were nominated by unaffiliated minority stockholders, and the Board "does not have a specific written policy or

process regarding the nominations of directors."   Additionally, the 2017 Proxy Statement disclosed:   "Our corporate governance guidelines do provide that a director is expected not to stand for reelection after the age of 75.   The Corporate Governance Committee recommended the Board nominate Mr. Krongard, age 79, for reelection to the Board based on his continued strong leadership and service on the Board both as Audit Committee Chairman and Lead Director, and the Board agreed with this recommendation."

70.    Regarding director compensation, the 2017 Proxy Statement disclosed that each of the directors except for Plank, including defendants Coltharp and Deering, had received between $200,000 and $240,000 in director fees during the previous year.   During 2016, Plank was compensated approximately $2.03 million and was granted a restricted stock award with the fair value of $5 million.

71.    The 2017 Proxy Statement disclosed that during 2016, the Audit Committee approved the following related-party transactions:

*Under Armour Corporate Offices*

In 2014 we entered into a lease agreement with an entity controlled by Mr. Plank to lease office space in a building located near our corporate headquarters in Baltimore, Maryland.   The lease had a 10 year term beginning in 2016.   In 2016, our total lease payments to Mr. Plank's company were approximately $0.7 million.   Following a third party appraisal, we determined the lease payments were at or below fair market lease rates.   We also determined that the location of the property as well as other favorable terms of the lease, such as renewal options and the right to occupy certain additional space without increased lease payments, provided us with overall terms that were both fair and reasonable to us and provided flexibility otherwise unavailable at alternative locations.   This lease was terminated without penalty upon our acquisition of the underlying property as described below.

Following the entry into this lease agreement, we determined that we would realize greater benefits by acquiring the parcel that includes the office building as well as surrounding parcels in order to further expand our corporate headquarters to accommodate our growth needs.   The location and size of the undeveloped parcels in close proximity to our current corporate headquarters provided us with a unique opportunity to develop a global headquarters suited to our needs and

corporate culture.   We engaged an independent third-party to appraise the fair market value of the parcels.   In addition, the Audit Committee engaged its own independent appraisal firm to assess the parcels.   In June 2016 we entered into a Purchase Agreement with entities controlled by Mr. Plank to acquire these parcels for a purchase price of $70.3 million.   We determined that the purchase price for these parcels represented the fair market value of the parcels and approximated the cost to the seller to purchase and develop the parcels, including costs related to the termination of a lease encumbering the property.   In connection with the purchase, in September 2016, the parties also entered into an agreement pursuant to which the parties will share the burden of any special taxes arising due to infrastructure projects in the surrounding area.   The allocation to us is based on the expected benefits to our parcels from these projects.   No obligations are currently owed by either party under this agreement.

The Audit Committee determined that the terms of the purchase were reasonable and fair and that we would realize significant benefits from the flexibility and certainty purchasing the parcels will provide us with respect to our ongoing campus growth needs.

In 2015 we also entered into a lease with an entity controlled by Mr. Plank to lease industrial space located near our corporate headquarters in Baltimore, which we use as an innovation and manufacturing testing facility and for other business purposes.   Given the location's proximity to our headquarters in Baltimore City, the use of this space provided a unique opportunity for us to build a state-of-the-art facility able to accommodate our innovation needs.   The lease covers 68,000 square feet and has a five year term, with payments beginning in April 2016.   The annual lease rate is currently $510,000, with the annual lease rate escalating 2.5% each year.   For 2016, our total lease payments were approximately $0.4 million.   Following an independent market rent appraisal, we determined that the lease payments were below fair market lease rates.   We also determined that the location of the property as well as other favorable terms of the lease, such as renewal options and flexibility regarding the design of the space, provide us with overall terms that were both fair and reasonable to us and provided flexibility otherwise unavailable at alternative locations.

*Aircraft*

A company owned by Mr. Plank owns a jet aircraft.   We have an operating lease agreement with the company to lease the aircraft when it is used by Mr. Plank or other persons for our business purposes.   We pay a fixed monthly lease payment of $166,667 under the terms of the lease agreement.   In addition, a company owned by Mr. Plank owns a helicopter aircraft.   In June 2016 we entered into a lease agreement with the company to lease the helicopter when it is used by Mr. Plank or other persons for our business purposes.   We pay an hourly lease rate of $6,500 under the terms of the lease agreement.   Our total lease amounts for 2016 with respect to these aircrafts were $2.4 million.

With respect to each of these aircraft, we determined that the lease payment rates are at or below the fair market value lease rate for these aircraft based on third party appraisals. The Audit Committee determined these lease terms were reasonable and that we would benefit by the use of each of the aircraft for company business.

*Hotel*

In March 2017, entities controlled by Mr. Plank and his brother Scott Plank opened a hotel located in Baltimore, Maryland. The hotel is operated by a third party management company. We anticipate utilizing this hotel from time to time for Under Armour business purposes. We have negotiated corporate rate discounts for use of the hotel with the management company, consistent with rates otherwise available for comparable hotels in the area.

The Audit Committee approved the terms of each of the foregoing transactions in accordance with our policy on transactions with related persons.

*Policies and Procedures for Review and Approval of Transactions with Related Persons*

Our Corporate Governance Guidelines require that any transaction involving Under Armour and a director or executive officer or entities controlled by a director or executive officer, be approved by our Board of Directors. The Board has delegated to the Audit Committee oversight and approval of these and other matters that may present conflicts of interest. The committee has adopted a formal written policy on transactions with related persons. Related persons are generally defined under SEC rules as our directors, executive officers, or stockholders owning at least five percent of our outstanding shares, or immediate family members of any of the foregoing. The policy provides that the committee shall review and approve or ratify transactions with related persons and any material changes to such transactions. The policy further provides that in determining whether to approve or ratify such a transaction, the committee may consider the following factors:

• whether the terms of the transaction are reasonable and fair to Under Armour and on the same basis as would apply if the transaction did not involve a related person;

• whether the transaction would impair the independence of a non-management director; and

• whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the committee deems relevant.

To the extent our employment of an immediate family member of a director, executive officer or five percent stockholder is considered a transaction with a related person, the policy provides that the committee will not be required to ratify or approve such employment if the executive officer, director or five percent stockholder does not participate in decisions regarding the hiring, performance evaluation, or compensation of the family member.

72. On April 14, 2017, *The Wall Street Journal* published an article titled "Under Armour Paid $73 Million to CEO's Businesses," which reported in part:

Under Armour Inc. paid more than $73 million last year to businesses controlled by Kevin Plank, far more than he earned as the athletic-gear maker's chief executive.

\*      \*      \*

[Plank] didn't receive a bonus or other incentive awards in 2016 after Under Armour fell short of profit targets.

\*      \*      \*

[T]he amount paid to Mr. Plank's other businesses comes as Under Armour's shares fell 30% in 2016 and nearly 34% this year through Thursday's close.   Mr. Plank's stake controls more than 65% of voting shares, according to the proxy.

Michelle Leder, editor and founder of Footnoted, a website which tracks securities filings by publicly traded companies, said such transactions in some cases could indicate that a company's board of directors has become "complacent" with regard to management.

"You see real estate, you see planes, and you ask, 'is this really an arm's-length deal?'" she said.   "I tend to look the other way if it's a couple hundred thousand dollars here or there, but if it's multiple deals amounting to millions of dollars, I take a closer look."

## DAMAGES TO THE COMPANY

73. As a direct and proximate result of the Individual Defendants' conduct, UA has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

      a.      Funds paid to entities owned and/or controlled by Plank in transactions that were not at arm's-length;

      b.      Plank's usurpation of millions in tax incentives and public financing that rightfully belonged to UA;

c.   Millions of dollars in compensation paid to Plank while he was breaching his duty of loyalty; and

d.   Director fees paid to Coltharp and Krongard while they were breaching their duty of loyalty by preferring the interests of Plank over the interests of UA.

74.   In addition, UA's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.   The Company still has not held defendants accountable for their intentional illegal acts.   As a result, the credibility and motives of management are in serious doubt.

75.   The actions complained of herein have irreparably damaged UA's corporate image and goodwill.   For at least the foreseeable future, UA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that UA's ability to raise equity capital or debt on favorable terms has already been impaired and will be in the future.

## DERIVATIVE AND DEMAND ALLEGATIONS

76.   Plaintiff brings this action derivatively in the right and for the benefit of UA to redress injuries suffered by UA as a direct result of the Individual Defendants' breaches of fiduciary duty detailed herein.   UA is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.   Plaintiff will adequately and fairly represent the interests of UA in enforcing and prosecuting its rights.

78.   Plaintiff was a stockholder of UA at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current UA stockholder.

**Plaintiff's Demand**

79.     Plaintiff made a Demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law.   When the Board rejected the Demand, the Board was not fully informed and was not acting independently.   Accordingly, the Board's refusal of the Demand was not a protected exercise of business judgment.

80.     On May 30, 2017, Plaintiff sent the Demand to the Board.   A true and correct copy of the Demand is attached hereto as Exhibit A.   The Demand states that Plaintiff is an owner of UA's common stock, and demands that the Board take immediate action to pursue litigation on behalf of the Company in connection with the related-party transactions detailed herein.

81.     In particular, the Demand describes that the Company's 2017 Proxy Statement revealed that the Company paid over $73 million to businesses controlled by Plank.   The Demand alleges that "[t]hese self-dealing transactions were not the product of arm's-length negotiations and rather served to enrich Plank personally to the detriment of the Company and its stockholders."   With respect to the purchase of the Port Covington parcel, the Demand specifically notes that in 2014, Plank's personal business purchased the plot for approximately $35 million, and managed to sell the land to UA less than three years later for twice that amount. The Demand further states:

> These exorbitant self-dealing transactions all took place as Under Armour's growth slowed in 2016 to its lowest level in eight years.   In 2016, Under Armour's shares fell 30% and have continued to fall another 30% thus far in 2017.   As it became clear that Plank would not receive incentive based compensation due to these poor results, he passed money from the Company to himself via the self-dealing transactions described above.
>
> According to the Under Armour's most recent proxy statement, filed with the Securities and Exchange Commission ("SEC") on April 13, 2017, Plank controls a 65.1% voting interest in the Company.   He therefore had the power to force the Company into these transactions unilaterally.   Even if the decisions were

presented to the full Board of Directors, each of the Directors was either selected by Plank to serve or could be personally removed by him as the controlling stockholder.

The Stockholder maintains that Plank, in concert with each of the other Directors and Officers, breached their fiduciary duties of loyalty and good faith by approving and/or knowingly allowing these unfair related party transactions. The Directors and Officers ignored, consciously disregarded, and/or were reckless in not establishing internal controls to prevent such blatant self-dealing.

As a result of the foregoing breaches of fiduciary duties, Under Armour has sustained damages. As a result of the inappropriate financial expenditures described above, millions of dollars have been misappropriated from Under Armour and its stockholders to Plank.

On behalf of the Stockholder, I hereby demand that the Board take action against the Directors and Officers to recover the damages described herein for the benefit of the Company and to correct the deficiencies in the Company's internal controls, accounting, and audit systems that fostered the misconduct described herein.

82.     Approximately five weeks later, by letter dated July 10, 2017, Plaintiff's counsel received a response from outside counsel to UA, Fried Frank, stating that the Company had received the Demand and "[o]nce the board has determined the appropriate course of action, we will contact you promptly."   A true and correct copy of the July 10, 2017 letter is attached hereto as Exhibit B.

83.     After another five weeks had passed, Plaintiff's counsel received a letter dated August 15, 2017 from a different law firm, Williams & Connolly LLP ("Williams & Connolly"), that had been "retained as counsel to group of directors who are reviewing your demand."   The letter requested documentation of Plaintiff's ownership of UA stock.   A true and correct copy of the August 15, 2017 letter is attached hereto as Exhibit C.

84.     On October 5, 2017, Plaintiff's counsel forwarded proof of Plaintiff's ownership of UA stock since January 17, 2006.

85.     By letter dated November 10, 2017, counsel from Fried Frank advised Plaintiff's counsel that the Board had rejected the Demand.   According to the letter, the Board "constituted a group of independent and disinterested directors to review the allegations set forth in [the Demand].   The review group, with the assistance of independent outside counsel, completed its investigation and issued a final report to the Board."   According to the letter, which did not identify the directors who voted to reject the Demand:

> The review group (i) found no evidence supporting the allegations set forth in your May 30, 2017 letter; and (ii) recommended that the Board decline to pursue claims against those whom you identified.

> At a meeting held on November 6, 2017, a majority of disinterested and independent directors voted to adopt the findings and recommendations in the report.

86.     A copy of the October 25, 2017 "Report and Recommendation of the Review Group of Under Armour Directors on the Demand Letter Submitted by Patricia Mioduszewski" (the "Refusal") was attached to the letter.   A true and correct copy of the Refusal is attached hereto as Exhibit D.   The Refusal demonstrates that the Board's response to the Demand was procedurally deficient under Maryland law and, as a result, was wrongful.

**The Board Did Not Act Independently**

87.     With the exception of Plank, the entire conflicted UA Board comprised of defendants Coltharp and Krongard, as well as non-party directors Bodenheimer, DeVard, Katz, McDermott, Olson, and Sanders, reviewed and rejected the Demand.[1]   None of these directors were disinterested and independent.

88.     Defendants Coltharp, and Krongard were the Audit Committee members who approved the related-party transactions at issue.   As such, they were unable to disinterestedly

---

[1] Although the Refusal does not identify the directors who voted to refuse the Demand, in subsequent correspondence, counsel from Fried Frank disclosed the identities of the directors who voted.

consider a demand to investigate and litigate against themselves.   Demonstrating their fealty to Plank, Coltharp and Krongard previously comprised the Special Committee that recommended measures in the 2015 Proxy Statement consolidating Plank's long-term control over the Company even though the changes were criticized by corporate governance experts.

89.     In addition, none of Coltharp, Krongard, Bodenheimer, DeVard, Katz, McDermott, Olson, or Sanders was independent of Plank or capable of disinterestedly assessing a demand to sue him.   Plank controls over 65% of the voting shares of UA, and at all times had sole discretion to elect or remove each and every director on UA's Board.   All of these directors would have risked removal from UA's Board or that Plank would not re-nominate them for future terms as directors if they voted to sue him.   Were Plank to remove these directors from their directorships, they would lose their access to over $200,000 per year in director fees and the prestige of serving as a director on the board of the second largest athletic apparel manufacturer in the world.   Indeed, with the exception of DeVard, each director recommended that the Company's stockholders support Plank's consolidation of long-term control in July 2015.

90.     Further demonstrating the Board's lack of independence, the Board declined to follow the well-established procedure under Maryland law to create a special litigation committee with full authority to decide issues raised by the Demand and appoint to that committee a clearly disinterested and independent outside director or directors.   The Board failed to do so despite its obvious lack of independence as a result of Plank's dominance.

91.     Rather than constitute an independent special litigation committee, the Board created a "review group."   The "review group," as its name suggests, was not an independent committee with a charter or authority to respond to the Demand.   Rather, it was an informal "group" comprised of directors Olson and Bodenheimer, with no formal governing documents

and the power only to investigate and present recommendations to the entire Board.   Due to the lack of governing documents, there is no indication that the review group's investigation was independent of interference from either the Board or Plank.

**The Board's Investigation Was Not Reasonable And Was Not In Good Faith**

92.     The Refusal demonstrates that the Board's process was not reasonable and in good faith, and its substantive conclusions likewise were not reasonable and in good faith.

93.     The Refusal does not adequately document the Board's procedures, reasoning, and conclusions.   At fifteen pages in outline form, the Refusal contains no appendices or exhibits to document how and on what basis the Board reached its conclusions.   This deficiency is particularly glaring because the conclusions reached by the Board are contradicted by the public record.

94.     The Refusal states:   "In *early 2016*, in considering where to move or expand the Company's corporate headquarters, both UA and the Audit Committee reviewed a number of different proposals. . . .   After multiple meetings, the Audit Committee approved the purchase of the Port Covington parcels in *June 2016* for $70.3 million."   Ex. D at 10-11 (emphasis added).   However, as alleged in detail above, since approximately January 2016, Plank had determined that UA would move to the Port Covington project and anchor the project permanently.   Sagamore was publicly claiming the same in its master plan for Port Covington, which it used to obtain hundreds of millions of dollars in city financing and tax incentives, that UA would be the long-term anchor of the development.   Accordingly, the Board's conclusion that the Audit Committee oversaw the Port Covington land transaction, ensured it was at arm's-length, and approved it in June 2016, was not reasonable, not in good faith, and is unsupported by evidence.

95.     The Refusal concludes that "Plank made no money on his sale of the Port Covington parcels to UA."   Ex. D at 13.   However, as alleged in detail above, Plank secured over hundreds of millions of dollars in public financing due to his decision that UA would occupy the Port Covington parcel.   He further stands to make billions more due to the development of his Port Covington project, none of which would have been possible with UA's long-term commitment to anchor the development.   As a result, the process employed by the Board in investigating this issue was clearly unreasonable and resulted in a conclusion that every resident of Baltimore who has followed the Port Covington saga since 2014 knows to be untrue. The investigation and consideration of this matter could not have been in good faith when the public record is so replete with descriptions of the many ways that Plank will profit enormously from the development, and the fact that Sagamore relied heavily on UA's presence as anchor of the development long-term in order to sell the project.

96.     The Refusal failed to consider relevant facts and legal standards to support its conclusion that Plank did not usurp a corporate opportunity.   Defendant Plank caused UA to agree to be the anchor of his development at Port Covington.   As a result of that action, Plank was able to obtain hundreds of millions of dollars in public financing and tax breaks.   Had UA's negotiation and purchase of the Port Covington parcel been at arm's-length, UA could realistically expect to take and obtain at least some portion of the public financing and tax breaks for itself in return for anchoring the development.   The Refusal fails to even address this issue.

97.     The Refusal fails to establish that the Board relied on independent counsel. Fried Frank was not independent as described above, and it is unclear to what extent the Board was advised by Fried Frank in its consideration of the Demand.   The Refusal claims Williams & Connolly was independent counsel.   While the Refusal states that Williams & Connolly does

not provide any other legal services to UA, it is silent as to whether Olson and Bodenheimer considered if the firm provides, or has provided in the past, any legal services to defendant Plank or any of his businesses, or to any party interested in the Port Covington development. Accordingly, Plaintiff infers that the Board did not inquire into these potential conflicts.   The Refusal therefore fails to adequately document the procedures, reasoning, and support for Olson and Bodenheimer's conclusion that their counsel was independent.   *See* Ex. D at 3.

98.   According to the Refusal, the entirety of Olson and Bodenheimer's investigation consisted of the following tasks performed by Williams & Connolly:   (i) counsel reviewed three categories of publicly available documents, including SEC filings and UA's governance documents, and one category of internal documents; (ii) counsel interviewed defendants Plank and Krongard, non-party director Deering, three non-defendant employees, and Tom Geddes, the Chief Executive Officer of Plank Industries; and (iii) counsel conducted legal research.   Ex. D at 4-5.   No explanation is provided why the third Audit Committee member, defendant Coltharp, was not interviewed.   Olson and Bodenheimer apparently were not present for the interviews and did not review the documents.   The failure to interview all three Audit Committee members, to be present for the interviews, and to interview officials from Sagamore indicates that the scope of the investigation was not reasonable.

99.   The Refusal states that Olson and Bodenheimer met once with Williams & Connolly on October 9, 2017.   Ex. D at 5.   Because the Refusal claims that Olson and Bodenheimer met once with Williams & Connolly, it is a reasonable inference that if the Board was advised by counsel at all prior to refusing the Demand, it was advised only by Fried Frank, which was not independent counsel.   Moreover, in a complex investigation involving transactions directly worth over $73 million, and issues implicating hundreds of millions of

dollars in public financing and tax incentives, a single meeting with counsel indicates an unreasonable investigation not conducted in good faith.

100.    The Refusal states that, presumably at their single meeting with counsel on October 9, 2017, Olson and Bodenheimer, "under the advice of counsel," considered the legal merits of the claims.   Based on the short summary in the Refusal, it is apparent that Olson and Bodenheimer did not apply the correct legal standards.

101.    The Refusal states that Olson and Bodenheimer considered that Maryland law applies a presumption of disinterest and independence to decisions of directors, however according to the Refusal, Olson and Bodenheimer did not consider the situations in which this presumption is rebutted, including where directors are self-interested and/or not independent of a controlling stockholder.   Olson and Bodenheimer did not evaluate whether the presumption of disinterest was rebutted as to them and as to the Individual Defendants who ultimately voted to refuse the Demand.   They likewise failed to consider whether any of the directors had interests in the Port Covington development that would make them interested in UA's purchase of the Port Covington parcel.   Their failure to consider whether the Board was independent of Plank or had financial interests in the Port Covington development demonstrates that they failed to apply the correct legal standards to the claims at issue.

102.    The Refusal states that Olson and Bodenheimer considered Md. Code Ann., Corps & Ass'ns § 2-419, regarding related-party transactions might provide a "safe harbor" for the transactions in question.   However, Section 2-419 by its mere existence does not exculpate otherwise actionable breaches of fiduciary duties, and the limited safe harbor it might provide is only applicable when a transaction is approved by a majority of disinterested directors.   Olson and Bodenheimer did not consider whether their fellow directors were disinterested due to

Plank's majority ownership of the Company and unilateral ability to remove them from the Board.   The Refusal therefore does not evidence a proper identification of the claims at issue and the application of correct legal principles to those claims.

103.   The Refusal states that Olson and Bodenheimer considered that the business judgment rule provides a presumption to all business decisions made by a board of directors. This was an incorrect application of the law.   Maryland's codification of the business judgment rule does not abrogate the fiduciary duty imposed upon a director or officer not to usurp a corporate opportunity.

104.   In the Refusal, Olson and Bodenheimer, who were ostensibly investigating, among other things, whether the Audit Committee's approval of the related-party transactions at issue was a breach of fiduciary duties, take a distinctly not disinterested view of the Audit Committee's procedures, which they characterize as "reflect[ing] the Audit Committee's cautious and deliberative approach towards [related-party transactions]."   They also editorialize that one action taken by the Audit Committee was "a measure of its independence and diligence."   When compared with their failure to identify or explain why Sagamore was publicly claiming UA would be a long-term anchor in the Port Covington development while the Audit Committee was purportedly considering other locations for the Company's headquarters and long before the Audit Committee had approved UA's purchase of the parcel, their characterizations of the Audit Committee's process are not reasonable and do not appear to have been made in good faith.

105.   With respect to the Audit Committee's independence, the Refusal avers that "there is no evidence that any member of the Audit Committee was controlled by Plank."   Ex. B at 8.   However, the Refusal does not document Olson and Bodenheimer's reasoning on this

point, what investigation supported the conclusion, and whether Olson and Bodenheimer considered that Plank could unilaterally terminate the Audit Committee members due to his control of the Company.   According to the Refusal, approval of related-party transactions with Plank were such a large part of the Audit Committee's responsibilities that "[p]rior to each Audit Committee meeting, Committee members receive a document prepared by UA summarizing all of UA's related-party transactions with Plank," and UA's operations are so closely aligned with Plank's other businesses that, "[s]enior personnel at UA meet quarterly with management at Plank Industries to identify all current and potential future related-party transactions between UA and Plank."   The Refusal's failure to document the process and reasoning to support the conclusion that the Audit Committee was independent demonstrates that the investigation was not reasonable and not in good faith.

106.   Due to the Board's failure to accurately identify the facts at issue and apply correct legal standards, and its failure to reach reasonable good faith conclusions supported by documented evidence, the conclusions regarding the cost of indemnification of legal fees and the impact of litigation on UA are unreasonable.   Without correctly identifying the facts at issue, the Board could not accurately evaluate the chances of success on the merits or the value of a potential recovery on behalf of UA.   Having failed to adequately investigate, this decision lacked basis.

107.   The Board's failure to convene an independent special committee, conduct a reasonable investigation, evaluate the merits, apply correct legal standards, evaluate chances for a recovery or potential amounts recoverable, or create a report documenting its supposed investigation cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law.   No legal action has been filed by

UA against any of the Individual Defendants.    Accordingly, Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

108.    Plaintiff has not made any demand on the other stockholders of UA to institute this action since such demand would be a futile and useless act for at least the following reasons:

a.    UA is a publicly-held company with over 442 million shares outstanding and thousands of stockholders;

b.    Making a demand on such a large number of stockholders would be impossible for Plaintiff who has no way of determining the names, addresses, or phone numbers of the other stockholders; and

c.    Making a demand on all stockholders would force Plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

### COUNT I

### BREACH OF FIDUCIARY DUTY AS TO DEFENDANTS COLTHARP AND KRONGARD

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    Defendants Coltharp and Krongard owed to the Company the duty to exercise good faith and loyalty in the management and administration of UA's business and affairs.    They were duty-bound to act in good faith in a manner they reasonably believed to be in the best interests of the Company, with the care that an ordinarily prudent person in a like position would use under similar circumstances.

111.    Defendants Coltharp and Krongard preferred the interests of defendant Plank over the interests of UA.    They permitted Plank to cause UA to acquire the Port Covington parcel in a transaction that was not at arm's-length and served Plank's interests and not those of UA.

Although Plank had already agreed that UA would purchase the Port Covington parcel, Coltharp and Krongard publicly misrepresented the process and their role in approving the transaction in the Company's 2017 Proxy Statement.   They disloyally rubber stamped a transaction that had already been agreed to, and then, with active and deliberate dishonesty, misrepresented in the Company's 2017 Proxy Statement their role in approving the transaction and the process they employed. They also misrepresented the process they employed and their role in approving the other related-party transactions described in the 2017 Proxy Statement.   These acts were non-exculpable breaches of the fiduciary duty of loyalty.

112.    Through the foregoing, Coltharp and Krongard willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in their role overseeing UA's business, rendering them personally liable to the Company for breaching their fiduciary duties.

113.    As a direct and proximate result of Coltharp and Krongard's breaches of their fiduciary obligations, UA has sustained and continues to sustain significant damages.   As a result, Coltharp and Krongard are liable to the Company.

## COUNT II

## BREACH OF FIDUCIARY DUTY AS TO DEFENDANT PLANK

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    Defendant Plank owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UA's business and affairs.   He was duty-bound to act in good faith in a manner he reasonably believed to be in the best interests of the Company, with the care that an ordinarily prudent person in a like position would use under similar circumstances.

116.     Defendant Plank's conduct set forth herein breached that duty.   Defendant Plank was UA's CEO and controlling stockholder and therefore ultimately controlled both the Company's conduct and the Board's conduct.   Plank acted with active and deliberate dishonesty by causing the Company to enter into numerous unfair related-party transactions that were not at arm's-length, and by misrepresenting the review process for those transactions and the benefit to the Company.   Plank acted with active and deliberate dishonesty by claiming that he received no benefit in the $70 million Port Covington land transaction.

117.     Plank received improper benefits as a result of his breaches of fiduciary duty. Through his control over UA and the Board, he directed over $70 million to himself and entities controlled by him in improper and unfair related-party transactions and used UA as a valuable building block for his Port Covington development without fairly compensating the Company. Plank caused UA to use corporate money to pay millions to companies that he owned and that he controlled and/or in transactions that were not at arm's-length, thereby enriching himself.

118.     Plank breached his duty of loyalty by usurping UA's opportunity to receive millions of dollars in public financing and tax breaks in return for the Company's decision to construct a permanent headquarters in the Port Covington development in Baltimore.   Had the land transaction been at arm's-length, UA would have had an interest or expectancy in receiving these benefits, and realistically could have seized and developed the opportunity to obtain them. Instead, Plank took them for himself.

119.     Through the foregoing, Plank willfully caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in his role overseeing UA's business, rendering him personally liable to the Company for breaching his fiduciary duties.

120.     As a direct and proximate result of Plank's breaches of his fiduciary obligations, UA has sustained and continues to sustain significant damages.   As a result, Plank is liable to the Company.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### AS TO DEFENDANTS COLTHARP AND KRONGARD

121.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.     Defendants Coltharp and Krongard knowingly assisted Plank's breaches of the duty of loyalty by allowing him to usurp UA's opportunity to obtain valuable public financing and tax incentives in return for the Company's decision to construct its new headquarters in the Port Covington development of Baltimore, which, without such aid, would not have occurred.

123.     As a direct and proximate result of Coltharp and Krongard's conduct, UA has sustained and continues to sustain significant damages.   As a result, Coltharp and Krongard are liable to the Company.

## COUNT IV

### UNJUST ENRICHMENT AS TO DEFENDANT PLANK

124.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.     By his wrongful acts, Plank was unjustly enriched at the expense of and to the detriment of UA.   Plank was unjustly enriched due to the benefits that he usurped from UA and the financial benefits he took due to his decision to use UA as the anchor in his Port Covington development without fairly compensating UA.

126.     Plaintiff, as a stockholder and representative of UA, seeks restitution from Plank and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Plank from his wrongful conduct and fiduciary breaches.

127.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THE FOREGOING REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of UA and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to UA and/or aided and abetting such breaches;

C.     Determining and awarding to UA the damages sustained by it as a result of the violations set forth above by each of the defendants, jointly and severally, together with interest thereon;

D.     Directing UA and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UA and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of UA's operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2.      a provision to permit UA's stockholders to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the establishment of effective oversight of UA's compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to UA exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding UA restitution from defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: April __, 2018                    ADELBERG, RUDOW, DORF & HENDLER LLC

                                         /s/_____
                                         Andrew Radding
                                         7 Saint Paul Street, Suite 600
                                         Baltimore, MD 21202
                                         (410) 539-5195

                                         Robert I. Harwood
                                         Benjamin I. Sachs-Michaels
                                         HARWOOD FEFFER LLP
                                         488 Madison Avenue
                                         New York, NY 10022
                                         (212) 935-7400

                                         Lawrence P. Eagel
                                         Melissa A. Fortunato
                                         Todd H. Henderson
                                         BRAGAR EAGEL & SQUIRE, P.C.
                                         885 3rd Avenue, Suite 3040
                                         New York, NY 10022
                                         (212) 308-5858

                                         Robert V. Prongay
                                         Lesley F. Portnoy
                                         GLANCY PRONGAY & MURRAY LLP
                                         1925 Century Park East
                                         Los Angeles, CA 90067
                                         (310) 201-9150

                                         *Plaintiff's Counsel*