**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| IN RE UNDER ARMOUR, INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 1:18-cv-01084-GLR |
| This Document Relates To: ALL ACTIONS. | (Consolidated with Civ. No. 1:18-cv-01264-GLR) |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Lead Plaintiff Scott King ("Lead Plaintiff"), by and through his undersigned counsel, submits this Verified Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and investigation undertaken by Lead Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Lead Plaintiff brings this action derivatively for the benefit of nominal defendant Under Armour, Inc. ("Under Armour" or the "Company") against its controlling stockholder and certain current and former members of its board of directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties and other violations of law.  For at least the past decade, Under Armour's founder and controlling stockholder Kevin A. Plank ("Plank") has caused the Company to engage in a multitude of related-party transactions with Plank and his related entities that have provided him a massive and unfair transfer of economic value at the Company's expense.

2.     Founded by Plank in 1996, Under Armour is a developer, marketer and distributor of performance apparel, footwear and accessories.

3.      After undergoing significant growth, Under Armour projected as early as 2008 that it would outgrow its then-current headquarters in the Locust Point section of South Baltimore (the "Locust Point Headquarters") in five years and would need to relocate.

4.      Initially, Plank sought to move the Company's headquarters to the West Covington section of South Baltimore through an urban renewal plan premised on the condemnation of properties.  City officials rejected that plan, but permitted development to continue in West Covington.

5.      Plank then focused his efforts on expanding the Company's existing Locust Point Headquarters.  Those efforts continued through much of 2014.

6.      While the Company publicly appeared committed to expanding its headquarters within the Locust Point area, this was essentially a ruse.  As early as 2012, Plank devised a plan to covertly acquire a substantial amount of real estate in the Port Covington neighborhood of South Baltimore with the intention of (1) selling some of this land to Under Armour for use as its future corporate headquarters, and (2) retaining and developing the remainder of the land as part of a massive real estate development project.  The bulk of Plank's secretive Port Covington real estate purchases occurred between 2012 and 2014 through Plank's long-time acquaintance Marc Weller ("Weller").

7.      In June 2014, it was revealed that Plank was aligned with Weller through Sagamore Development Co., LLC ("Sagamore"), a real estate acquisition and development company owned by Plank through his personal holding company, Plank Industries.  Just one month earlier, Plank said "I have no comment on Port Covington" at the Company's annual meeting in response to questions about his suspected involvement in the area.

8.      In September 2014, Plank leased Port Covington land owned by Sagamore to the Company for occupancy beginning in early 2016.  The Board's Audit Committee, then comprised of defendants A.B. Krongard ("Krongard"), Douglas E. Coltharp ("Coltharp") and former director Anthony W. Deering ("Deering"), approved the lease.

9.      In March 2015, Plank publicly announced his plan to transform the Port Covington land he had acquired into a mixed-use neighborhood anchored by Under Armour's new corporate headquarters.  In connection with the announcement, Plank disclosed that he would be seeking ultimate approval from the Baltimore City Council for a tax increment financing plan ("TIF") to fund the project.

10.     In early January 2016, Plank and Sagamore began a series of presentations and advertisements designed to garner the requisite city approvals for the Port Covington redevelopment project, including the TIF funding.  The relocation of Under Armour's corporate headquarters to Port Covington was the centerpiece of this campaign.

11.     In late June 2016, Plank and Sagamore received a crucial design approval from the Baltimore Planning Commission ("BPC") for the Port Covington project.  In September 2016, Plank and Sagamore received ultimate approval from the Baltimore City Council and then-Baltimore City Mayor Stephanie Rawlings-Blake ("Mayor Rawlings-Blake") for the project, including $660 million in TIF funding.

12.     Shortly after receiving the key approval from the BPC in June 2016, Plank caused Under Armour to purchase for $70.3 million the land that the Company had leased from Sagamore (the "Port Covington Sale").  The purchase price paid by Under Armour in connection with the Port Covington Sale was ***more than twice*** what Plank and Sagamore paid for the land just two years earlier.  The Audit Committee approved the Port Covington Sale.

13.     In addition to the Port Covington Sale, Plank has caused the Company to enter into a number of additional related-party transactions with himself and his affiliates.  As detailed in Under Armour's Annual Proxy Statement filed with the U.S. Securities and Exchange Commission ("SEC") on March 28, 2018 (the "2018 Proxy"), Under Armour leases a jet aircraft and helicopter from entities owned by Plank.  Similarly, the Proxy contains additional details regarding other related-party transactions between Plank and Under Armour, including a lease for industrial space and a hotel co-owned by Plank and his brother Scott Plank ("S. Plank").

14.     Through this action, Lead Plaintiff seeks to (1) remedy the unlawful Port Covington Sale and related-party transactions involving Under Armour on the one hand and Plank and/or his affiliates (such as Sagamore) on the other, and (2) compel Plank and/or his affiliates to disgorge to Under Armour the excessive payments and/or benefits received in connection with those transactions.

## PARTIES

15.     Lead Plaintiff is a holder of shares of Under Armour common stock, was a holder of shares of Under Armour common stock at the time of the wrongdoing alleged herein, and has been a holder of shares of Under Armour common stock continuously since that time.  Lead Plaintiff is a citizen of Virginia.

16.     Nominal defendant Under Armour is a Maryland corporation with its principal executive offices located at 1020 Hull Street, Baltimore, Maryland 21230, and is a citizen of Maryland.  Under Armour develops, markets and distributes branded performance apparel, footwear and accessories.  Shares of Under Armour's Class A and Class C common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbols "UAA" and "UA," respectively.

17.    Defendant Plank is the founder of Under Armour and has been its controlling stockholder, Chairman of its Board and Chief Executive Officer of the Company since its inception in 1996.  Plank also served as the Company's President from the Company's inception to 2008 and from 2010 to 2017.  In addition to his roles at Under Armour, Plank pursues a number of commercial endeavors and business ventures through his personal holding company, Plank Industries.  These endeavors include, among others: (1) Sagamore; (2) Sagamore Ventures, a venture capital company; (3) Sagamore Racing, a professional horse racing team; (4) Sagamore Spirit, a whiskey company; (5) Baltimore Water Taxi, an aquatic taxi service; and (6) Sagamore Pendry Baltimore, a hotel Plank co-owns with his brother S. Plank.  With reference to these endeavors, Plank has described himself as "a conflicted man on many levels."  Plank currently serves on the board of directors of the V Foundation; the board of trustees of Johns Hopkins Medicine;[1] the board of trustees of the University of Maryland College Park Foundation, Inc. ("UMCPF"), the fundraising arm of the University of Maryland College Park ("University of Maryland"); and the board of directors of the Boomer Esiason Foundation.[2]  Plank is a citizen of Maryland.

---

[1] Plank and Under Armour's affiliations with Johns Hopkins Medicine and Johns Hopkins University affiliates are myriad.  In 2014, Under Armour made a $10 million donation to Johns Hopkins Medicine to fund research.  In January 2017, Under Armour entered into a partnership with Johns Hopkins Medicine for Johns Hopkins Medicine to further develop the Company's connective health and fitness technologies.  In July 2017, Johns Hopkins Technology Ventures announced that it had joined Plank Industries in supporting M-1 Ventures, a Baltimore-based startup accelerator focused on connected health and fitness technologies.  In August 2017, Under Armour and Johns Hopkins University entered into an agreement for the Company to be the official outfitter of the university's athletic program.

[2] Plank also has extensive ties to the University of Maryland.  Plank is an alumnus of the university, where he played on the university's football team.  In 2014, Plank donated $25 million toward a plan to transform a university basketball arena into a $155 million indoor football practice facility and academic research complex.  In addition, Under Armour is the official outfitter of the University of Maryland's athletic program and Plank has been rumored to have considerable sway

18.     Defendant Byron K. Adams, Jr. ("Adams") was an Under Armour director from 2003 through May 2017.  Adams served as Senior Advisor to Plank from October 2013 to November 2014 and as Chief Performance Officer of Under Armour from October 2011 to September 2013.  Prior to joining Under Armour, Adams founded and was managing director of Rosewood Capital, LLC ("Rosewood"), a private equity firm focused on consumer brands. Rosewood, through its affiliates, was the institutional investor in the Company prior to its initial public offering ("IPO").  Adams is a citizen of Connecticut.

19.     Defendant George W. Bodenheimer ("Bodenheimer") has served as a director of Under Armour since August 2014.  Bodenheimer joined the Board after serving as Executive Chairman of ESPN, Inc. ("ESPN") from January 2012 to June 2014.  More recently, Bodenheimer rejoined ESPN as its Acting Chairman from December 2017 to March 2018.[3]  Bodenheimer serves on the board of directors of the V Foundation, and chairs the V Foundation's "Not a Moment to Lose" fundraising project which seeks to raise over $200 million from its inception in 2013 to 2020.  Bodenheimer also serves on the board of directors of the V Foundation with Plank.  In each of 2017 and 2018, Bodenheimer received $225,000 in total compensation for his role on the Under Armour Board.  Bodenheimer is a citizen of Connecticut.

---

over the university, including its athletic department.  Indeed, a University of Maryland regent told ESPN in November 2012 that Plank was "heavily involved behind the scenes with board members" regarding the university's then-contemplated move to another athletic conference.  A November 2012 Forbes article describes Plank as "one of the most active supporters of the University [of Maryland]," and one of a "growing class of billionaires funneling tens of millions of dollars into college athletics."  More recently, in April 2017, Plank donated $200 million to the University of Maryland in exchange for the right to name nine of the university's twelve remaining undergraduate schools and colleges.  At the time, the donation was the largest in the university's history.  Plank is also involved with the university's Robert H. Smith School of Business.

[3] During this time period, Under Armour and ESPN announced that they had partnered on an urban revitalization project in Baltimore and two other U.S. cities.

20.     Defendant Coltharp has been an Under Armour director since 2004.  Coltharp has been a member of the Audit Committee since as early as 2006, and approved the Port Covington Sale as well as the other improper related-party transactions between the Company and Plank described herein.     In each of 2017 and 2018, Coltharp received $235,000 in total compensation for his role on the Under Armour Board.  Coltharp is a citizen of Alabama.

21.     Defendant Karen W. Katz ("Katz") has been an Under Armour director since 2014.  In each of 2017 and 2018, Katz received $225,000 in total compensation for her role on the Under Armour Board.  Katz is a citizen of Texas.

22.     Defendant Krongard has been an Under Armour director since 2005.  Krongard has been a member of the Audit Committee since as early as 2005, and approved the Port Covington Sale as well as other improper related-party transactions between the Company and Plank described herein.  Since September 2009, Krongard has been a member of the board of directors of Iridium Communications Inc. ("Iridium"), a satellite communications company.  Krongard is an emeritus trustee at Johns Hopkins Medicine and has served as a trustee since at least 2004.  Krongard is an alumnus of the University of Maryland School of Law.  In each of 2017 and 2018, Krongard received $265,000 in total compensation for his role on the Under Armour Board.  Krongard is a citizen of Maryland.

23.     Defendant William R. McDermott ("McDermott") has been an Under Armour director since August 2005.  McDermott has served as the chief executive officer of SAP SE ("SAP"), a business software company, since May 2014 and executive board member of SAP since 2010.  McDermott served as co-chief executive officer of SAP from February 2010 to May 2014 and prior thereto as President of Global Field Operations and chief executive officer of SAP Americas & Asia Pacific.  McDermott joined SAP in 2002.  Since June 2005, Under Armour has

been a customer of SAP through various industry license agreements. In addition, in 2015, the Company entered into an agreement with SAP to engage SAP to assist in Under Armour's ongoing initiative that includes the implementation of SAP's fashion management software. Under Armour's relationship with SAP is material to both entities. A November 2017 article published by ZDNet notes that "Under Armour has bet heavily on SAP and become one of the software giant's best-known customers," while another November 2017 article published in CFO.com observes that "Under Armour is one of SAP's most-touted customers." SAP and Under Armour tout their relationship through various advertisements and promotional events. In each of 2017 and 2018, McDermott received $235,000 in total compensation for his role on the Under Armour Board. McDermott is a citizen of Pennsylvania.

24.     Defendant Eric T. Olson ("Olson") has served as a director of Under Armour since July 2012. According to the Company's Proxy Statement on Schedule 14A filed with the SEC on March 15, 2013, Olson was elected to the Board upon the recommendation of Krongard. In each of 2017 and 2018, Olson received $225,000 in total compensation for his role on the Under Armour Board. Olson has been a member of the board of directors of Iridium since 2011. Olson is a citizen of California.

25.     Defendant Harvey L. Sanders ("Sanders") has been an Under Armour director since 2004. Sanders is a member of the board of trustees of the UMCPF, where he previously served as chairman, and a member of the board of directors of the Boomer Esiason Foundation. Sanders is also an alumnus of the University of Maryland, where he played on the university's basketball team and more recently has been a fundraiser for the program. Aside from his affiliations with the University of Maryland's basketball program, Sanders has also supported the Robert H. Smith School of Business, the Keep Me Maryland Fund, the Department of Communication and the

Philip Merrill College of Journalism, where he serves on the advisory board for the Shirley Povich Center for Sports Journalism.   In each of 2017 and 2018, Sanders received $237,500 in total compensation for his role on the Under Armour Board.  Sanders is a citizen of New York.

26.     Sagamore is a Baltimore-based real estate development company owned and controlled by Plank through Plank Industries.  Sagamore is a citizen of Maryland.

27.     The defendants listed in paragraphs 17 through 25 above are collectively referred to herein as the "Director Defendants."

28.     The defendants listed in paragraphs 16 through 26 above are collectively referred to herein as the "Defendants."

### RELEVANT NON-PARTIES

29.     Plank Industries is a privately-held investment company that serves as Plank's family office.  According to its website, Plank Industries' "[k]ey investment holdings include Sagamore Spirit and a major equity stake in the Port Covington redevelopment project in South Baltimore."  According to Maryland state records, the owner of Plank Industries is KDP Investments, LLC ("KDP").  KDP was formed on January 8, 2013 by Thomas J. Sippel ("Sippel"). Sippel served as a director at Under Armour from 2001 to April 2015 and is a partner of the law firm of Gill Sippel & Gallagher.  Sippel has performed substantial legal services for Under Armour and Plank, and Plank appointed Sippel as the manager of two limited liability companies controlled by Plank.  The Company has regularly admitted in its public filings that Sippel was not an independent director.  Upon information and belief, while Sippel was serving as a member of the Board, he was simultaneously effectuating Plank's secret plans for the Port Covington redevelopment project through his involvement with Plank and his affiliates, including Plank Industries and KDP.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between Lead Plaintiff and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

31.     This Court has jurisdiction over each defendant because each defendant is a corporation that conducts business in and maintains operations in this District, a citizen of Maryland and/or an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

32.     The Company's Annual Meeting of Stockholders ("Annual Meeting") has been held in the state of Maryland each of the last three years at the Company's offices located at 2601 Port Covington Drive, Baltimore, Maryland, and is scheduled to be held there once again on May 9, 2019.

33.     According to Under Armour's Annual Proxy Statement filed with the SEC on March 27, 2019, "[a]ll of our directors attended our 2018 Annual Meeting of Stockholders."  The Company's 2018 and 2017 Proxy Statements contain identical language with respect to the Company's 2017 and 2016 Annual Meeting.  For the Company's 2015 Annual Meeting, Under Armour disclosed that "[n]ine out of ten directors attended."

34.     In 2018, there were eleven meetings of the Board and twenty-two meetings of the Board's four committees.  All but two "directors attended at least 75% of the aggregate meetings of the Board and the committees of which they were members[.]"

35.     In 2017, there were ten meetings of the Board and twenty-six meetings of the Board's four committees.  All "directors attended at least 75% of the aggregate meetings of the Board and the committees of which they were members."

36.     In 2016, there were fourteen meetings of the Board and thirty-one meetings of the Board's four committees.  As was the case for 2017, all "directors attended at least 75% of the aggregate meetings of the Board and the committees of which they were members."

37.     In 2015, there were ten meetings of the Board and eighteen meetings of the three then-existing Board committees.  Again, all "directors attended at least 75% of the aggregate meetings of the Board and the committees of which they were members."

38.     Each of the Director Defendants has earned hundreds of thousands of dollars for their service to a Maryland corporation, and each has participated in meetings conducted in Maryland that were relevant to the claims alleged herein.

39.     Consequently, all members of the Board have more than adequate contacts with the State of Maryland and this District to support this Court's personal jurisdiction over them.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because during the wrongdoing alleged herein, Under Armour maintained its principal place of business in this District, one or more of the Director Defendants resides in or maintains an office in this District, a substantial portion of the transactions complained of herein occurred in this District, and Defendants have received substantial compensation in this District by, as explained above, doing business here and engaging in numerous activities that had an effect in this District.

## DUTIES OF THE DIRECTOR DEFENDANTS

41.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to

benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.      To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)      exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

(b)      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority; and

(c)      refrain from unduly benefitting themselves and other Company insiders at the expense of the Company and its shareholders.

43.      The Director Defendants, as directors of Under Armour, were required to comply with the duties set forth in Section 2-405.1 of the Maryland Corporations and Associations Code that requires a director of a Maryland corporation to act (1) in good faith; (2) in a manner the director reasonably believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances.  The common law supplements these statutory duties.

44.     The Director Defendants, including Krongard and Coltharp as members of the Audit Committee, were required to comply with the Company's policies and procedures governing related-party transactions.   The 2018 Proxy describes the Board's "Policies and Procedures for Review and Approval of Transactions with Related Persons" as follows:

> Our Corporate Governance Guidelines require that any transaction involving Under Armour and a director or executive officer or entities controlled by a director or executive officer, be approved by our Board of Directors.  The Board has delegated to the Audit Committee oversight and approval of these and other matters that may present conflicts of interest.  The committee has adopted a formal written policy on transactions with related persons.  Related persons are generally defined under SEC rules as our directors, executive officers, or stockholders owning at least five percent of our outstanding shares, or immediate family members of any of the foregoing.  The policy provides that the committee shall review and approve or ratify transactions with related persons and any material changes to such transactions.  The policy further provides that in determining whether to approve or ratify such a transaction, the committee may consider the following factors:
>
> * whether the terms of the transaction are reasonable and fair to Under Armour and on the same basis as would apply if the transaction did not involve a related person;
>
> * whether the transaction would impair the independence of a non-management director; and
>
> * whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the committee deems relevant.

45.     The Director Defendants, because of their positions of control and authority as officers and/or directors of Under Armour, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### *Plank Has Controlled Under Armour Since Its Inception*

46.     Plank founded Under Armour in 1996 and has been the Company's controlling shareholder since its inception.

47.     On November 17, 2005, Under Armour conducted its IPO at $13 per Class A share. Following the IPO, Plank retained about one-third of the company's outstanding shares, but maintained voting control through his nearly exclusive ownership of the Company's Class B Convertible Common Stock, each share of which is entitled to ten votes for every vote of Class A common stock.[4]

48.     As of February 25, 2015, Plank controlled 66.9% of the Company's voting power and owned 16.8% of its common stock.

49.     As of February 23, 2018, Plank owned 15.8% of the Company's Class A and Class B stock, and 15.2% of the Company's Class C stock.  His equity ownership provides him with 65% of the total voting power of all outstanding shares of Under Armour stock, and the ability to control the election of directors and veto fundamental corporate transactions.

50.     As discussed below, Plank's historic and uninterrupted control over the Company has allowed him to engage in a myriad of related-party transactions with Under Armour.

### The Port Covington Sale

### Under Armour Outgrows Its Locust Point Headquarters

51.     Plank founded Under Armour in 1996, when he began selling the Company's signature moisture-wicking performance shirt.   After some initial struggles, the Company experienced significant growth.

52.     In 1999, Under Armour was asked to create uniforms for the film *Any Given Sunday*, one of the year's most talked-about movies, which caused a spike in the popularity of the Company's apparel.   Recognizing the opportunity to leverage the exposure from *Any Given*

---

[4] On November 18, 2005, in connection with the IPO and in exchange for 16,200,000 shares of Class A common stock, the Company issued an aggregate of 16,200,000 shares of Class B Convertible Common Stock to Plank and two Plank-related entities.

*Sunday*, Plank bought Under Armour's first print advertisement in *ESPN the Magazine*. Over the next two years, Under Armour formed relationships with key retail partners and professional leagues, including Major League Baseball, the National Hockey League, and the Baltimore Marathon.

53.   By 2002, Under Armour products were carried in roughly 2,500 retail stores throughout the United States. That same year, Under Amour moved its global headquarters to an old soap factory in the Locust Point section of South Baltimore (previously defined herein as the "Locust Point Headquarters").

54.   After moving to the Locust Point Headquarters, Under Armour's rapid growth continued and the Company went public in November 2005.

55.   By late 2006, Under Armour had reached capacity at its Locust Point Headquarters. The Baltimore Development Company (the "BDC"), the city's economic development arm, began working with the Company to find additional space for its operations. At the time, Under Armour was considering several options, including leasing a larger space in Locust Point or relocating its headquarters elsewhere in the city.

56.   In May 2007, Under Armour reached an agreement to expand its Locust Point Headquarters and remain there for an additional five years. As part of the agreement, Under Armour acquired approximately 20,000 additional square feet. Prior to the agreement, the Company was under two lease agreements for its Locust Point Headquarters, one of which expired in April 2007 and another that was set to expire in April 2009. The new agreement covered both leases and was scheduled to expire in April 2012 with an option for a two-year renewal.

57.   In December 2007, Under Armour completed another expansion to keep pace with the Company's continued growth. Under this proposed expansion, Under Armour would lease

140,000 square feet across the street from the Locust Point Headquarters. The move was viewed as a temporary one for Under Armour while it worked on its long-term plan of building a new corporate headquarters.

***Plank Attempts to Relocate Under Armour's Headquarters to West Covington, But Is Denied***

58.     One month after expanding its Locust Point headquarters, Under Armour and BDC began to explore the West Covington section of South Baltimore as a potential new home for the Company's future headquarters. On January 28, 2008, the *Baltimore Business Journal* reported on this endeavor as follows:

> Publicly traded sportswear maker Under Armour Inc., quickly outgrowing its home at the Tide Point business park in Locust Point, has put the city's controversial 40-acre West Covington redevelopment on a short list for its future corporate headquarters, the city's economic development chief said.
>
> Kevin A. Plank, Under Armour's CEO, has spoken with officials at the Baltimore Development Corp. about submitting a development bid for the waterfront site in South Baltimore, BDC President M.J. "Jay" Brodie said. West Covington, west of Hanover Street and the Port Covington shopping center beyond it, is one of just a few viable options in the city large enough to accommodate the fast-growing company.[5]

59.     In order to accommodate Under Armour's relocation to West Covington, the BDC proposed an urban renewal plan which, if adopted by Baltimore City Council, would have given the BDC the ability to acquire the land by condemnation and sell the newly-acquired properties to private companies. Under this plan, however, the BDC would be unable to sell the properties exclusively to Under Armour. Instead, the BDC would be required to conduct a public bidding process in order to provide other companies and developers the opportunity to acquire the land.

---

[5] Daniel J. Sernovitz, *Under Armour eyes city site for HQ; West Covington may suit firm's growth, BDC says*, BALTIMORE BUSINESS JOURNAL, Jan. 28, 2008. A subsequent article reported that "Brodie said [Under Armour] has shown him sketches of what an Under Armour campus would look like at West Covington." Daniel J. Sernovitz, *Residents 'in limbo' as BDC mulls fate of waterfront property*, BALTIMORE BUSINESS JOURNAL, Feb. 18, 2008.

Presumably, this bidding process would have had the effect of increasing the price of the subject properties.

60.    On February 21, 2008, the city's planning commission rejected the BDC's proposal, which would have authorized the BDC to condemn the land of seven homeowners and three businesses.  The commission, however, indicated that other development in the area could continue.

### Plank Seeks to Expand Under Armour's Locust Point Headquarters

61.    In April 2008, Plank made it publicly known that Under Armour planned to build a corporate campus in Baltimore.  According to an April 26, 2008 article published by *The Baltimore Sun*, "[c]ity officials have said they talked with Under Armour executive[s] about several city sites as a possible new home.  But until yesterday, the company has never confirmed its interest in larger digs."[6]

62.    Shortly thereafter, Under Armour began to turn its attention toward expanding, and building a campus around, its Locust Point Headquarters.  In December 2009, the Company moved into its recently-leased space located across the street from the Locust Point Headquarters.  With the addition of this new space, Under Armour occupied five buildings in Locust Point totaling 265,000 square feet.

63.    In the ensuing years, Under Armour moved forward with developing its corporate campus in Locust Point.  In April 2011, the Company expanded its available borrowings under its credit agreement to up to $325 million, including $25 million for use in its planned purchase of its Locust Point Headquarters.  In July 2011, Under Armour finalized an agreement to buy the 400,000-square foot business park housing its Locust Point Headquarters for $58.0 million with

---

[6] Andrea K. Walker, *Under Armour Plans for 'Campus'; CEO Plank Confirms Desire for a Larger Presence in City*, The Baltimore Sun, Apr. 26, 2008.

the intent of transforming the site into the Company's corporate campus. In September 2011, Under Armour unveiled its plan for its new campus, which included an additional 400,000 square feet of space encompassing a retail store, a company museum, parking garages, office space, employee housing, a restaurant and a city park, among other things.

64.     In September 21, 2012, the Baltimore City Council approved $35 million in TIF funding for the expansion of the Locust Point Headquarters.[7] In January 2013, Baltimore's Urban Design and Architecture Review Panel ("UDARP") approved the plans for the Locust Point expansion, and in March 2013, Under Armour began work on the project.

### Plank Makes His Personal Play for Port Covington

65.     While the Company publicly appeared committed to expanding its headquarters in and around Locust Point, this was essentially a ruse. Indeed, in 2015, Plank revealed in an interview that his plans to expand the Locust Point Headquarters were scuttled *in 2012* when the Baltimore Museum of Industry rejected a significant expansion project that was proposed by the Company. As a result, Plank was required to look elsewhere to find a permanent home for the Company's headquarters.

66.     Armed with this knowledge, Plank positioned himself to personally profit from the Company's future expansion efforts—this time in Port Covington—through Sagamore.

67.     Specifically, Plank Industries chief executive officer Tom Geddes ("Geddes") and Sagamore President Weller led an effort to secretly acquire a large swath of property in Port Covington, a run-down former rail and industrial area along South Baltimore's waterfront. Weller

---

[7] It was also around this time that S. Plank announced his retirement from the Company to start War Horse LLC ("War Horse"), a real estate development firm, and continue his focus on private real estate investment projects. S. Plank held various roles during his seventeen-year career at Under Armour, including as Executive Vice President of Business Development from August 2009 until his retirement in September 2012. S. Plank also headed Under Armour's real estate division.

was described by *The Baltimore Sun* as "literally [] a front man for [Plank]" in the real estate acquisitions.[8]

68.     Weller knocked on the doors of Port Covington landowners to inquire about potential real estate acquisitions.  As he did so, Weller carefully avoided questions about who was financing the offers to purchase the landowners' property.  Plank obscured his purchases of real estate in Port Covington through the use of shell companies with generic names such as "300 East Covington." As reported by the Washington Post, "to make the plan work, [Plank] needed to move quickly and quietly, the developers said . . . . '[t]he use of names and addresses that didn't tie back to Kevin [Plank] was all very intentional,' Weller said. 'We wanted to be successful in acquiring as much as possible as quickly as possible.'"[9]

69.     The bulk of Sagamore's furtive Port Covington real estate purchases occurred between 2012 and 2014.  For example, *The Baltimore Sun* detailed how "[a] large waterfront parcel in Port Covington sold for $2 million in 2012 to an investor who declined to identify himself.  Then a second large property sold nearby.  Then a third.  Each time, the investor's identity was hidden behind hard-to-trace limited liability companies."[10]  The article further reported how:

---

[8] *The Baltimore Sun* described Weller's engagement in the project as follows:

> Kevin [Plank] called me out of the blue, and said, "Marc [Weller], I'd really like to talk with you about the future of Under Armour."

> Eager to stay in Baltimore, Under Armour officials printed out aerial maps of the city to look for open space.

> "It became incredibly obvious Port Covington was ripe for development," Weller said.

Luke Broadwater and Natalie Sherman, *Quiet Start, Noisy Debate*, THE BALTIMORE SUN, Sept. 18, 2016, at A1.

[9] *Id.*

[10] *Id.*

Companies discreetly owned by Plank purchased his first Port Covington property at a foreclosure auction.   A Plank-owned whiskey distillery is now under construction on that site.  His second purchase, 101 W. Dickman St., reopened last year as the City Garage incubator and event space.  The third, a roughly $35 million deal revealed in January 2014 that included a Walmart and a former Sam's Club building, made it clear that someone was assembling property in the area.

70.   Later that year, a Plank entity purchased for $46.5 million a 60-acre property in Port Covington that included the site of *The Baltimore Sun's* printing plant.

71.   Weller ultimately purchased 27 properties in Port Covington, including a concrete plant, a lumberyard, a pier, an abandoned Sam's Club store and *The Baltimore Sun's* printing plant. The Port Covington acquisitions totaled over 160 acres, and the total cost according to Sagamore was approximately $114 million.

### *Plank Announces That Under Armour Will Move Its Headquarters to Port Covington*

72.   Throughout 2014, Plank—in both a personal capacity and as a representative of Under Armour—remained coy, if not downright deceptive, to the Company's shareholders in response to speculation that he was the man behind the rapid acquisitions in Port Covington.  For example, after it was suggested in an April 2014 article in *The Baltimore Sun* that Plank was seeking to build a distillery for Sagamore Spirit in Port Covington, Plank stated at the Company's May 2014 annual meeting of shareholders that "[t]here are no plans on where the thing will be at this point."   In response to general questioning at the annual meeting about whether he was investing in the area, Plank replied: "I have no comment on Port Covington."

73.   One month later, in June 2014, the *Baltimore Business Journal* published an article linking Plank, Weller and the rapid investments in Port Covington.  The article stated:

Under Armour Inc. CEO Kevin Plank is aligned with a Bethesda developer behind the assembly of 70 acres of waterfront property at Port Covington.

Marc Weller, who was formerly involved in single-family home development in Washington, D.C., is listed in city documents released on Monday as a co-owner of Plank's Sagamore Development Co. LLC[.]

Sagamore was formed to spearhead the conversion of the Fells Point Recreation Pier into a boutique hotel, but City Planning Director Thomas Stosur confirmed that the department was approached by Plank's representatives about building a whiskey distillery at Port Covington.

That query concerned a 5.2-acre parcel acquired at auction in 2012 that was later linked to Weller, who is also listed on state records as the manager of a neighboring 58-acre parcel that sold in January for $35 million.  The mostly vacant land houses just a Walmart and a shuttered Sam's Club.[11]

74.    In September 2014, Plank leased Port Covington land owned by Sagamore to the Company for occupancy beginning in early 2016.  The Board's Audit Committee, then comprised of Defendants Krongard and Coltharp and former director Deering, approved the lease.

75.    The Company first disclosed the lease in its Annual Report on Form 10-K filed with the SEC on February 20, 2015 (the "2014 10-K").  Specifically, the 2014 10-K disclosed that "[i]n 2014 [the Company] entered into a lease for an additional 130 thousand square feet of office space located near our principal offices in Baltimore in order to expand our corporate headquarters."  The 2014 10-K further disclosed that the lease was entered with "an entity controlled by the Company's CEO" for a ten-year term beginning in 2016 and expected lease payments of $1.1 million.

76.    The *Baltimore Business Journal* surmised that the leased property was part of the 58-acre Sam's Club parcel which Sagamore acquired in January 2014.  The article noted:

The disclosure of the 10-year lease was made in a Feb 20 Securities and Exchange Commission filing, and is described as an effort to "expand our corporate headquarters" in Locust Point.  A specific location of the space isn't disclosed in the filing, but it describes the 130,000-square-foot space as being "near our principal offices in Baltimore."

. . . .

Because the filing describes the 130,000 square feet of office space as being separate from the company's Locust Point headquarters, it raises questions about

---

[11] Kevin Litten, *Mystery developer behind Port Covington acquisitions is a Kevin Plank business partner*, BALTIMORE BUSINESS JOURNAL, June 10, 2014.

whether the office space is located in Port Covington.  That's the peninsula where Plank-connected shell companies have been acquiring real estate along the South Baltimore waterfront, not far from Under Armour's Tide Point campus.

One of the buildings acquired as part of the 128 acres in real estate transactions at Port Covington is the 130,500-square-foot shuttered Sam's Club.  City records show that two building permits were issued for that building in February, which describes interior demolition work occurring ahead of a more extensive plan pending approval by the city.[12]

77.    In early March 2015, Plank made his first public acknowledgement about his broad

vision for the land he had secretly acquired in Port Covington, as well as his intention for the area

to serve as a new global campus for Under Armour as it outgrew its Locust Point Headquarters.

An article published by the *Baltimore Business Journal* that day detailed Plank's plan:

> Under Armour Inc. CEO Kevin Plank on Monday outlined a broad vision for the land he's been acquiring in South Baltimore, much of which will become a new campus for the sportswear maker as it outgrows its Tide Point headquarters.
>
> It was the first time Plank has spoken publicly - or even acknowledged directly - acquiring more than 128 acres of land at Port Covington he's been assembling for a real estate project of massive proportions.  Although Plank said the area will eventually become a mixed-use project that will include housing, Plank said the big focus now is plotting the best use of the land for Under Armour's continuing growth.
>
> . . . .
>
> . . . Plank said he's likely to pursue a tax increment finance plan which must be approved by the City Council to build the infrastructure needed to support further development at Port Covington.[13]

78.    Later that day, the *Baltimore Business Journal* published another article revealing

that Plank's decision to amass property in Port Covington came after his plans to further expand

the Locust Point Headquarters were rejected by the Baltimore Museum of Industry:

---

[12] *See* Kevin Litten, *Under Armour is going to lease office space from CEO Kevin Plank*, BALTIMORE BUSINESS JOURNAL, Feb. 24, 2015.

[13] Kevin Litten, *Kevin Plank unveils vision for Port Covington – and it includes Under Armour's future HQ*, BALTIMORE BUSINESS JOURNAL, Mar. 2, 2015.

In an interview about plans to build 3 million square feet of space for a new Under Armour campus in South Baltimore, Plank revealed how he had unsuccessfully pursued a partnership with the Museum of Industry in 2011.  The plan included expanding the museum to make it a "museum of industry, innovation and entrepreneurship;" building a 100,000-square-foot Under Armour store; developing a hotel; and building towers that would give Under Armour room to expand.

The museum, at 1415 Key Highway, is near Under Armour's existing Tide Point campus.

"We spent huge sum of money with outside architects, I bought a couple pieces of ground on Key Highway" adjacent to the Museum of Industry, Plank said.  "We told them what we wanted to do, we spoke about our goals and what we have for this entire area."

Plank said he figured the Museum of Industry's board of directors would be keen on the plan because it would bring the energy of Under Armour to Key Highway and draw more people to the area.  It would've also increased the number of people working in the immediate area from 80 to 2,000.

Plank got the news that the Museum of Industry board voted down the plan while he was in Dubai at the One & Only resort with Todd Montesano, Under Armour's senior director of advertising.

. . . .

Plank recalled being incredulous about the denial, saying, "we contemplated the neighborhood association, we contemplated the open view lanes, we contemplated building a park on the water - how could this possibly have gotten voted down?"

In the end, he said he decided that "***I never want to be beholden to a vote of some board*** or politics ***or anyone else***."[14]

79.    An article published by *The Baltimore Sun* the following day further detailed Plank's pivot into real estate and his exploitation of Under Armour as the primary catalyst for engineering the success of this personal endeavor.  The article stated, in pertinent part:

Plank said he decided to go into real estate after being rebuffed by the board of the Baltimore Museum of Industry in 2012 when he proposed an expansion that would have included its Locust Point property.

. . . .

---

[14] Kevin Litten, *How a deal gone wrong for Under Armour's Plank to start buying land at Port Covington*, Baltimore Business Journal, Mar. 2, 2015 (emphasis added).

The rejection came while he was in Dubai, a city that has experienced a massive building boom in the last decade.  "*I thought to myself, we could do something like that," he said, "Number one, I've got the engine in Under Armour.  Number two . . . I can afford to make these decisions, so why am I waiting on [the Museum of Industry] board of directors?*"[15]

80.    On September 8, 2015, *The Baltimore Sun* reported that Under Armour retained the architectural firm of Bohlin Cywinski Jackson to prepare the master plan for the Company's new campus in Port Covington.

81.    On September 16, 2015, Plank confirmed at the Company's investor day that Under Armour's new campus would be situated in Port Covington.  Plank declared Under Armour's new campus "[would] redefine Baltimore's front porch as much as anything else."  Plank explained that *he* "made the *personal investment* in a piece of land in Baltimore to help [Under Armour] build a better house . . . ."

82.    In January 2016, Sagamore presented Plank's master plan for Port Covington to UDARP.  The *Baltimore Business Journal* described these plans as follows:

> Early plans for the ambitious South Baltimore project include up to 13 million square feet of office, residential, retail, restaurants, "maker space" and entertainment venues, as well as 40 acres of public parks and green spaces.  An extension of the Light Rail, bus routes and water taxi are also proposed, a move aimed at connecting the development to the rest of the city.
>
> Officials with Sagamore Development Co. LLC, the real estate arm of Plank, and architects of the project unveiled the conceptual plans on Wednesday ahead of an initial presentation today to the city's Urban Design and Review Panel.
>
> At the heart of the redevelopment will sit a 50-acre, 3-million-square-foot campus for Under Armour, the fast-growing sportswear maker.  The campus will hold 5,000 Under Armour . . . employees, the first of which will begin to move into offices there this year at the site of a defunct Sam's Club.

> . . . .

---

[15] Natalie Sherman, *Under Armour sees Port Covington as space to grow; Company assembles large tract for development*, THE BALTIMORE SUN, Mar. 3, 2015 (emphasis added).

Plank, the billionaire founder of Under Armour, has been buying up properties at Port Covington for several years, using discreet LLCs to mask his interest and spending $90 million over a 12-month period in 2014 to purchase 128 acres there.

. . . .

The Port Covington development will require public financing and tax breaks such as tax increment financing from city, state and federal sources, Weller said, because the site has no infrastructure in its current state.  Sagamore Development plans to pursue those public incentives and federal funding beginning in the spring, Weller said.

. . . .

To date, Sagamore Development owns a total of 161 acres in Port Covington, or 61 percent of the land it is planning to redevelop under the master plan, officials said Wednesday.[16]

83.     Later that month, plans for Under Armour's new Port Covington campus were revealed to UDARP.  Around that time, Plank and Sagamore also revealed plans for the Sagamore Spirit distillery which, through a park, would be linked to Under Armour's new campus.

84.     In early March 2016, Sagamore made a presentation to the BDC's project review and oversight committee wherein Plank and Sagamore requested $535 million in TIF funding from Baltimore City, by far the largest in the city's history.  During the presentation, Sagamore said that it would also be seeking over $570 million in state and federal government financing.  Sagamore also stated that its development of Port Covington would cost $5.5 billion.  Later that month, the BDC made a recommendation to approve the request.  News reports revealed that total government financing for the Port Covington project had reached $1.4 billion.

85.     In early May 2016, the Baltimore City Board of Finance approved Sagamore's request for $535 million in TIF funding, setting the stage for City Council and mayoral review.

---

[16] Melody Simmons, *Kevin Plank's real estate firm offers first look at multibillion-dollar Port Covington project*, BALTIMORE BUSINESS JOURNAL, Jan. 7, 2016.

86.     On June 23, 2016, the BPC voted to approve the master plan for Port Covington which, according to *The Baltimore Sun* , was a "big step forward."  As reported in an article dated July 14, 2016, a Baltimore City Councilman deciding how to vote on the Port Covington project referred to it as a "greased deal" because city officials had already said they would "get it done."[17]

87.     In September 2016, the Baltimore City Council voted to approve the Port Covington project, including $660 million in TIF funding.  Then-Baltimore City Mayor Rawlings-Blake approved the deal shortly thereafter.

88.     Little more than one week after receiving BPC approval, Plank caused Under Armour to buy for $70.3 million the Port Covington land it was leasing from Sagamore.  The purchase price paid by Under Armour in connection with the Port Covington Sale was ***more than twice*** what Plank and Sagamore paid for the land just two years earlier.  The Audit Committee approved the Port Covington Sale.

89.     Plank's grand vision for his real estate holdings in Port Covington caused the Company to overpay for the land it needed for its new headquarters.

90.     In addition to being unjustly enriched at the Company's expense through the overpriced Port Covington Sale, Plank will also reap a windfall from Sagamore's future development of the Port Covington area.  *The Baltimore Sun* reported how Sagamore and Plank intend to make additional sales of land in the Port Covington area to "partners," and detailed the substantial profit that Plank expects to receive from those additional land sales as follows:

> . . . Sagamore, which amassed about 160 acres there over several years, has said it plans to sell land to partners to redevelop the area, which is south of Interstate 95 on the Patapsco River's Middle Branch.

---

[17] John Lee, *One city councilman calls Port Covington a "greased deal*," www.YPR.org, July 14, 2016.

. . . .

***Sagamore is expected to make $400 million from land sales during the multi-decade project***, according to an analysis conducted for the city.[18]

91.     In addition to land sales, Plank and Sagamore stand to profit from many pet ventures in Port Covington, the prospects for which have been catapulted by Under Armour's new headquarters in the area.  In October 2015, Plank and Sagamore's innovation hub, City Garage, obtained its first tenant, The Foundery, Inc., an affiliate of Sagamore Ventures that offers machine tools, woodworking and metalworking equipment and training for the public.  Since then, several other tenants have moved into the facility, including Under Armour itself.  One year later, in October 2016, Plank Industries purchased the Baltimore Water Taxi from Harbor Boating, Inc. ("Harbor Boating").[19]  In April 2017, Plank opened the Sagamore Spirit distillery to the public.

92.     Accordingly, the Company's decision to acquire the parcels from Sagamore not only enriched Plank through the excessive purchase price, it also substantially bolstered the prospects and value of Plank's other Port Covington real estate holdings, and development and investment aspirations.

93.     On September 13, 2017, Sagamore announced that it had partnered with The Goldman Sachs Group, Inc. ("Goldman Sachs"), which had committed to invest $233 million in Sagamore's Port Covington project.  Discussing the newly-formed partnership with Goldman

---

[18] Natalie Sherman, *Under Armour Buys Port Covington land for $70.3 million*, THE BALTIMORE SUN, July 18, 2016 (emphasis added).

[19] According to a *Baltimore Business Journal* article, "[w]hen talks between Sagamore [Development] and Harbor Boating started about 18 months ago, Geddes said it was Plank who was driving the discussions . . . . It really came from Kevin, who looked at the harbor as one of the most important assets the city has," Geddes said. . . . Plus with Port Covington, he was looking at transportation."  Jonathan Munshaw, *Why Kevin Plank is buying the Baltimore Water Taxi*, BALTIMORE BUSINESS JOURNAL, Aug. 16, 2016.

Sachs, Geddes stated that Plank Industries and Goldman Sachs shared a "common vision for urban economic growth" and that Goldman Sachs's investment "represents a major step forward in the Port Covington development."  William Cole IV, president of the BDC, said the partnership with Goldman Sachs "is a very good sign that the project is getting ready to gear up."

94.      On April 4, 2018, *The Baltimore Sun* reported that "[w]ork [wa]s underway on Phase 1B at the 235-acre Port Covington redevelopment."[20]   The same article quoted a representative of the Goldman Sachs Urban Investment Group, who stated that "[t]he level of interest [in the Port Covington project] right now is far more than you would typically see for an investment at this stage[.]"[21]

95.      In September 2018, *The Baltimore Sun* and various other sources reported that over the next three years, Weller Development would build out one-third of the planned apartments, offices, and retail space for the 260-acre peninsula.  Much of that development consists of the peripheral businesses that will enrich Plank and Sagamore.  On September 19, 2018, *The Architect's Newspaper* reported that "Phase 1 construction includes outfitting the neighborhood with 12 new buildings featuring office space, room for retail, and 1.34 million square feet of residential.  A 156,000-square-foot hotel will also rise on the site."[22]

96.      The Port Covington project is also attracting significant interest as a burgeoning cybersecurity hub.  An October 18, 2018 article in *The Baltimore Sun* explained that efforts to develop Port Covington as "the epicenter of a Silicon Valley of the East" had resulted in

---

[20] Adam Marton, Natalie Sherman & Caroline Pate, *Port Covington redevelopment examined*, THE BALTIMORE SUN, available at http://data.baltimoresun.com/news/port-covington/.

[21] *Id.*

[22] Sydney Franklin, *Baltimore's Port Covington to be the Silicon Valley of athletics wear*, THE ARCHITECT'S NEWSPAPER, September 19, 2018.

announcements from three cybersecurity firms that they would "open headquarters by 2020 in the project's first development phase[.]"[23]  Regarding those commitments, Weller commented that "[t]he impact they will have cannot be overstated," "[s]ome of these highly respected businesses are leaving Silicon Valley . . . in order to become part of something new and exciting," and "[w]ith these companies on board, Port Covington is on course to become the first-of-its-kind cyber ecosystem."[24]

97.     Thus, as Plank and Sagamore planned, anchoring the development project with Under Armour's headquarters has allowed them to attract high-profile private investors.  The announcement of Goldman Sachs's investment, the prospective emergence of Port Covington as a cybersecurity epicenter and other developments suggest the project is only poised for more growth and private investment.

### *Other Related Party Transactions with Plank and His Affiliates*

98.     Unfair related-party arrangements such as the Port Covington Sale are all too common between Plank and Under Armour.  An April 2017 article in *The Wall Street Journal* questioned the fairness of Under Armour's frequent related-party transactions:

> Michelle Leder, editor and founder of Footnoted, a website which tracks securities filings by publicly traded companies, said such transactions in some cases could indicate that a company's board of directors has become "complacent" with regard to management.
>
> "You see real estate, you see planes, and you ask, 'is this really an arm's-length deal?'" she said.  "I tend to look the other way if it's a couple hundred thousand dollars here or there, but if it's multiple deals amounting to millions of dollars, I take a closer look."[25]

---

[23] Lorraine Mirabella and Meredith Cohn, *Cybersecurity hub planned for Baltimore's Port Covington with announcement of three new tenants*, THE BALTIMORE SUN, October 18, 2018.

[24] *Id.*

[25] Sara Germano, *Under Armour Paid $73 Million to CEO's Businesses*, THE WALL STREET JOURNAL, Apr. 14, 2017.

99.     For example, Under Armour has an operating lease agreement with a Plank entity to lease the latter's jet aircraft—even when it is used by Plank—for Under Armour business purposes.  In addition, a company owned by Plank owns a helicopter, and in June 2016, Under Armour entered into a lease agreement to lease the helicopter from the Plank-owned company.

100.    The Company paid $2.2 million, $2.4 million, $2.0 million, and $1.8 million in lease payments to this Plank entity for its use of these aircrafts during the years 2017, 2016, 2015 and 2014, respectively.

101.    A March 5, 2019 *Forbes* article reported that rumors of (1) Plank's "questionable relationship" with a media personality "that could be influencing company decisions" and (2) Plank's misuse of his aircraft lease to the Company, "can [] hurt the CEO and the company's reputation and can call into question the overall internal controls [at Under Armour]."[26]

102.    Moreover, as noted, Under Armour is a tenant at Sagamore's innovation hub, City Garage.  The Company entered into this lease agreement in 2015.  The lease is for a five-year term with an annual lease rate of $0.5 million, subject to an annual escalation rate of 2.5%.

103.    In addition, in March 2017, Plank opened a hotel located in Baltimore, Maryland which is co-owned by Sagamore and War Horse, the real estate development company controlled by S. Plank.  While the hotel is operated by a third-party management company, Under Armour anticipates utilizing this hotel for Under Armour business purposes, and Plank and his brother are entitled to receive a certain amount of any profits generated by the hotel.  Under Armour's total payments to the hotel in 2017 totaled $0.4 million.

---

[26] Betsy Atkins, *A Misstep For Under Armour CEO*, Forbes, March 5, 2019.

**_Under Armour's Stock Has Plummeted Approximately 80% Since 2015; Plank Admits That
He "Lost Focus" on Under Armour While Pursuing Personal Ventures_**

104.    While Plank has focused on his personal ventures, Under Armour's performance
has declined and its stock price has plummeted.  Indeed, since reaching a five-year high of almost
$100 per share in the summer of 2015 (*i.e.*, just after Plank publicly announced the Port Covington
redevelopment project), Under Armour's stock price has declined approximately 80% to a current
trading price of approximately $20 per share.

105.    In November 2017, reports emerged that Plank confided in financial commentator
Jim Cramer that Plank "lost focus" on Under Armour while pursuing his personal ventures, and
thus permitted the Company's performance to decline.  Plank's stark admission confirms that
Plank prioritized his own interests at the expense of the Company.

106.    Since Plank's 2017 admission, the Company has not been able to right its course.
On February 12, 2019, *The Wall Street Journal* noted that:

> Under Armour has been updating its "restructuring plan" since it was first
> announced in the summer of 2017.  Chief Executive Kevin Plank said then that
> 2017 was a "reset" for the business and the brand as it tried to address persistent
> problems such as slowing revenue growth and churn in its offices.  But Under
> Armour keeps extending that reset.[27]

## THE DIRECTOR DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

107.    In connection with the foregoing misconduct, Plank breached his fiduciary duties
to the Company by, *inter alia*, (1) exploiting confidential Company information (*i.e.*, the
Company's need to move its headquarters and likely move to Port Covington) for his own gain;
(2) usurping from Under Armour a corporate opportunity to purchase and develop land for the
Company's future campus and headquarters location; (3) front-running the Company to increase

---

[27] Elizabeth Winkler, *Under Armour's Never-Ending Story*, THE WALL STREET JOURNAL, Feb. 12,
2019.

the price of the land in Port Covington that he would subsequently cause the Company to buy; (4) causing the Company to buy the land in Port Covington from Sagamore/Plank at an excessive price; and (5) causing the Company to enter into a number of other unfair related-party transactions with his personally-owned entities.

108.    The members of the Board other than Plank also breached their duties to the Company by, *inter alia*, (1) approving the purchase of the land in Port Covington from Plank and Sagamore at an inflated price, and (2) approving a myriad of other unfair related-party transactions designed to unfairly benefit Plank and his affiliated entities.

109.    Faced with Plank's continual pattern of self-interested actions and abuses of power, the Board members have knowingly and repeatedly failed to take necessary steps to control or address Plank's impropriety.  Indeed, as recently as February 21, 2019, *The Wall Street Journal* reported that former and current executives of Under Armour had confirmed that there are "many ways the CEO blurred the distinction between his personal activities and Under Armour."[28]  The article further reported that "***For years***, several of his friends held senior leadership roles . . . and some Under Armour employees have been paid by Mr. Plank."[29]  Years of knowing failures to check Plank's misconduct and self-dealing reflects the individual Board members' knowing elevation of Plank's interests over the best interests of the Company and its public stockholders.

110.    The Board members' knowing failure to stand up to Plank reflects a disturbing pattern with respect to Plank.  Indeed, a March 26, 2016 article in *The Baltimore Sun* described Plank as "a guy politicians are reluctant to question or alienate."[30]  The circumstances surrounding

---

[28] Khadeeja Sadfar, *Meet Under Armour CEO's Unusual Adviser: An MSNBC Anchor*, THE WALL STREET JOURNAL, Feb. 21, 2019.

[29] *Id.* (emphasis added).

[30] Dan Rodricks, *Port Covington plan looks great, but not a no-brainer*, THE BALTIMORE SUN, Mar. 26, 2016.

the Port Covington project confirm that the Board members suffered from that same reluctance, in direct contravention of their fiduciary duties.

111.    As a direct and proximate result of the misconduct alleged herein, the Company has suffered harm.  In addition to the profit that Plank and Sagamore have already received by causing Under Armour to relocate its headquarters to Port Covington and to reportedly purchase real estate for double what Sagamore paid for that land, Plank and Sagamore stand to receive substantial additional profits in the form of (1) the increased property value of the Port Covington real estate holdings that Sagamore/Plank have *not* already sold to Under Armour, and (2) the receipt of additional remuneration as Sagamore/Plank's other Port Covington property is sold or developed. Indeed, according to an analysis conducted for the City of Baltimore, Plank and Sagamore are expected to make $400 million from land sales alone in connection with the development of their Port Covington real estate holdings.  Despite its role as the centerpiece of a multi-billion dollar development project, Under Armour will receive none of the economic benefits that Sagamore/Plank will enjoy.  The Company has suffered additional monetary damages through the overpayment to Plank and his affiliates in connection with the other related-party transactions complained of herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

112.    Lead Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Plank's, Sagamore's and the other Director Defendants' breaches of duties and other violations of law.

113.    Lead Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

114.    Lead Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

115.    On May 25, 2017, Lead Plaintiff sent the Board a letter demanding that the Board commence an action against Plank, the other Director Defendants and Sagamore in connection with the breaches of duties and other violations of law complained of herein (the "Demand").  A copy of the Demand is attached hereto as Exhibit 1.

116.    On June 1, 2017, Under Armour's counsel at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") acknowledged receipt of the Demand.  A copy of the June 1, 2017 letter is attached hereto as Exhibit 2.

117.    On June 21, 2017, Lead Plaintiff's counsel received a letter from the law firm of Williams & Connolly LLP ("W&C") advising that W&C had been retained "as counsel to a group of directors who are reviewing [the] [D]emand."  A copy of the June 21, 2017 letter is attached hereto as Exhibit 3.

118.    On June 23, 2017, Lead Plaintiff's counsel sent a letter to W&C which, among other things, requested identification of the "group of directors" who were purportedly reviewing the Demand.  A copy of the June 23, 2017 letter is attached hereto as Exhibit 4.

119.    After failing to receive a response for over two months, on August 24, 2017, Lead Plaintiff's counsel sent a letter to W&C which (1) again requested identification of this "group of directors," and (2) asked for an update on the status of their purported review.  A copy of the August 24, 2017 letter is attached hereto as Exhibit 5.

120.    On August 28, 2017, Lead Plaintiff's counsel received a cryptic e-mail from W&C acknowledging receipt of the August 24, 2017 letter and advising that it was "referred . . . to Under

Armour and the Company's legal counsel."  Later that day, Lead Plaintiff's counsel replied to

W&C's e-mail, stating:

> Thank you for your email, but I am confused by it.  My understanding is that the "group of directors" to whom my client's demand has purportedly been referred retained your firm to assist in its purported investigation.  Is that not correct?  If it is correct, why are you referring my letter of August 24 to "Under Armour and the Company's legal counsel"?

Lead Plaintiff's counsel received no response to this email.

121.  On November 10, 2017, Fried Frank, on behalf of the Company, sent Lead

Plaintiff's counsel a letter stating:

> As noted in prior correspondence, the Company's board of directors (the "Board") constituted a group of independent and disinterested directors to review the allegations set forth in your letter [the "Review Group"].  The [R]eview [G]roup, with the assistance of independent outside counsel, completed its investigation and issued a final report to the Board [the "Initial Report"] . . . . The [R]eview [G]roup (i) found no evidence supporting the allegations set forth in [the Demand]; and (ii) recommended that the Board decline to pursue claims against those . . . identified [therein].

> At a meeting held on November 6, 2017, the majority of disinterested and independent directors voted to adopt the findings and recommendations in the [Initial] [R]eport.

Neither the November 10, 2017 letter nor the Initial Report identified the directors who voted to

approve the Review Group's findings or the circumstances under which the recommendation and

vote took place.  A copy of the November 10 letter and accompanying Initial Report are attached

hereto as Exhibit 6.

122.  The Initial Report finally disclosed that the Review Group was comprised of

Defendants Bodenheimer and Olson.

123.  The Initial Report claimed that the Review Group purportedly (1) found no

evidence supporting the allegations in the Demand and (2) recommended the Board decline to

pursue claims relating to those allegations.

124.    The Initial Report and the investigation on which it was purportedly based were materially deficient in a number of ways and reflect the inadequate process undertaken by the Board and the Review Group in response to the Demand and the underlying allegations therein.

125.    *First*, the "Key Findings" section of the Initial Report notes that "[i]n early 2014, Plank, through an entity known as Sagamore . . . acquired a number of parcels around Port Covington." Initial Report at 9.  This finding overlooks a key fact noted in the Demand: that secret Port Covington real estate purchases by Plank/Sagamore occurred as early as *2012*.[31]  The Initial Report's finding that Plank/Sagamore's purchases began "[i]n early 2014" also ignores and contradicts various news reports that have linked pre-2014 real estate transactions to Plank/Sagamore.

126.    *Second*, the "Key Findings" section of the Initial Report notes that "[a]lthough Plank discussed this vision [to transform Port Covington into a multi-use development], there is no evidence that Plank acquired parcels [in the area] on the understanding that [Under Armour] would ultimately purchase the parcels from him." Initial Report at 9.  A finding of "no evidence" on this issue lacks credibility because other findings within the Initial Report suggest that: (1) as early as 2014, Under Armour was contemplating moving its corporate headquarters to Port Covington; and (2) but for the presence of a Wal-Mart store at the leased Port Covington property, Under Armour would have purchased this parcel outright instead of leasing it from Sagamore/Plank (and Under Armour eventually did purchase the property after Sagamore negotiated a lease buy-out with Wal-Mart).  Such a finding is also highly questionable because in March 2015, and again at the Company's investor day in September 2015, Plank stated that his

---

[31] *See* Demand at 2 (citing an article in *The Baltimore Sun* that linked a 2012 Port Covington waterfront parcel purchase to Plank/Sagamore).

Port Covington land purchases were intended to provide a new home for Under Armour's corporate headquarters.[32]  In short, taken together, the Initial Report and the public record strongly demonstrate that Plank/Sagamore began acquiring the Port Covington parcels as early as 2012 with the specific intention for Under Armour to eventually purchase those parcels for use as its new corporate headquarters.

127.  *Third*, the "Key Findings" section of the Initial Report notes that "[i]n early 2016, in considering where to move or expand the Company's corporate headquarters, both [Under Armour] and the Audit Committee reviewed a number of different proposals.  Port Covington emerged as an attractive candidate at the end of this process . . . ."  Initial Report at 11.  The Initial Report's finding that Under Armour and the Audit Committee were still considering Port Covington as a ***potential*** site for the Company's new headquarters in 2016 is confounding because in September 2015—months before "early 2016," when the Company and the Audit Committee were purportedly reviewing proposals—Plank made it clear that Port Covington was his preferred destination for the Company's headquarters.  In other words, the decision to move Under Armour's corporate headquarters was made much earlier than the "early 2016" timeframe indicated in the Initial Report.

128.  *Fourth*, the "Key Findings" section of the Initial Report notes that "[p]rior to 2014, Plank approached the Board to propose that the Company purchase land around Port Covington, in order to accommodate the Company's growing need for space" (Initial Report at 9), and the "Conclusions" section of the Initial Report notes that "[t]he evidence . . . does not support a claim for usurpation of corporate opportunity [because] Plank presented the Board a proposal to purchase

---

[32] As noted, other news reports from early March 2015 revealed that Sagamore/Plank's Port Covington acquisitions arose after Plank's plans to further expand the Company's existing headquarters were rejected by the Baltimore Museum of Industry in 2012.

parcels surrounding Port Covington [and] the Board, exercising its business judgment, and in light of the risks presented, declined to do so" (*id.* at 13-14). The Initial Report fails to clarify whether (and if so, when) Plank informed the Board, Audit Committee and/or Company that he intended to move the Company's headquarters to Port Covington. Such a fact is critical in determining whether Plank usurped a corporate opportunity from the Company.

129.    *Fifth*, the "Key Findings" and "Conclusions" sections of the Initial Report state that "Plank made no money on [the Port Covington Sale]." Initial Report at 11, 13. Those findings are carefully worded to exclude Sagamore's past and future revenue, as well as the millions of dollars in revenue Plank and Sagamore stand to make through the Port Covington project as Under Armour's new campus attracts additional tenants and businesses, thereby increasing the value of all of Plank and Sagamore's other holdings in Port Covington. The Initial Report's narrow focus on the Port Covington Sale in a vacuum conveniently ignores the immense economic value which Under Armour's presence provides to Plank/Sagamore's plans for Port Covington. Indeed, without Under Armour, it is questionable whether there would be a Port Covington project at all.

130.    *Sixth,* the limited scope of the review conducted by W&C further indicates that the Review Group's investigation was not reasonable and lacked good faith. As an initial matter, W&C did not interview Sagamore President Weller, a key figure in Sagamore/Plank's acquisition of the Port Covington parcels and Sagamore/Plank's vision for the development of the area, or S. Plank, who was heavily involved in Under Armour's real estate endeavors prior to his departure in 2012, and who subsequently partnered with Sagamore on a Baltimore real estate venture. In addition, W&C did not interview Coltharp, who was a member of the Audit Committee at the time the Port Covington Sale and other related-party transactions were approved. Any reasonable process would have included interviews of these key individuals.

131.    Also, W&C's failure to review pre-2014 Board and Audit Committee materials in light of the Initial Report's own discussions of pre-2014 interactions between Plank and the Board is a substantive and harmful oversight.  *See* Initial Report at 4.

132.    Furthermore, W&C only reviewed documents from Under Armour, not Sagamore or Plank (in his personal capacity or as a representative of Plank Industries or Sagamore).  Given that Sagamore/Plank's Port Covington acquisitions were effectuated by Plank in his personal capacity (as the owner and controller of Sagamore and/or Plank Industries) and that a key aspect of Lead Plaintiff's claims concern Sagamore/Plank's intended use of the Port Covington parcels, any reasonable investigation into the Demand would have sought documents from Sagamore, Plank Industries, and Plank himself.

133.    *Seventh*, the Initial Report contains no appendices or exhibits to document how and on what basis the Review Group reached its conclusions.  The failure to do so is particularly troublesome in light of the myriad factual inconsistencies contained in the Initial Report and the many deficiencies in the Review Group's investigation identified herein.

134.    *Eighth*, the Review Group's members—Olson and Bodenheimer—participated in the investigation in only a perfunctory fashion.  W&C conducted all document review and interviews.  By contrast, the Review Group members only met with W&C ***one time***—on October 9, 2017 "to discuss the status of the investigation"—and outside of that, merely communicated "from time to time" with counsel.  Initial Report at 5.  The Initial Report does not describe the substance of that single meeting or the periodic communications between the Review Group and its counsel.  In addition, there is no indication that the Review Group members participated in any capacity in the drafting or review of the Initial Report.  There is also no indication that the Review Group or its counsel made any presentation to the Board regarding its findings.

-39-

135.    *Ninth*, the members of the Review Group do not appear to be able to independently and impartially consider the Demand.  Olson's concurrent service with Krongard on the board of another publicly-traded company, as well as Krongard's recommendation as to Olson's appointment to the Board, casts doubt as to whether Olson could impartially consider whether Krongard breached his fiduciary duties by approving the related-party transactions complained of herein.  In addition, Bodenheimer currently serves along with Plank as a member of the board of directors of the high-profile V Foundation, which casts doubt as to whether Bodenheimer could independently determine whether Plank breached his fiduciary duties and committed other violations of law in connection with Plank's engineering of the Port Covington project and the related party transactions complained of herein.  Moreover, Olson and Bodenheimer—as well as the remaining members of the Board—are beholden to Plank, who, as controlling stockholder of the Company, can determine whether either individual remains a director of the Company.  Accordingly, the Initial Report's findings that "there is nothing to suggest" Olson or Bodenheimer could not impartially consider the Demand is incorrect.  Initial Report at 3.[33]

136.    *Lastly*, it is unclear whether and to what extent W&C and the Review Group's investigation was impacted by the Company's counsel, Fried Frank.  Lead Plaintiff's suspicions regarding Fried Frank's involvement are bolstered by the August 2017 email from W&C stating that Lead Plaintiff's counsel's letter was being "referred . . . to Under Armour and the Company's legal counsel."  The fact that W&C was "referring" correspondence regarding the Review Group's

---

[33] Similarly, the Initial Report's finding at page 9 that there is "no evidence that any member of the Audit Committee [which approved the related-party transactions at issue] was controlled by Plank" is controverted by Plank's ability to control their directorships, and their other business and personal affiliations with him.

investigation to the Company's counsel suggests that W&C was not acting independently of the Company and its controller Plank.

137.    On January 8, 2018, Lead Plaintiff's counsel sent a letter to Fried Frank outlining certain of the foregoing concerns with the Initial Report and Review Group investigation. A copy of the January 8 letter is attached hereto as Exhibit 7.

138.    After receiving no response from the Company or its counsel for almost two months, on March 2, 2018, Lead Plaintiff's counsel sent a letter to Fried Frank to follow-up on the unanswered January 8, 2018 letter. A copy of the March 2 letter is attached hereto as Exhibit 8.

139.    On March 16, 2018, Fried Frank wrote on behalf of the Company, stating that "[t]he Company has provided the Review Group with your correspondence." A copy of the March 16 letter is attached hereto as Exhibit 9.

140.    On April 30, 2018, Lead Plaintiff filed his Verified Shareholder Derivative Complaint (the "Original Complaint"). The Original Complaint outlined the material deficiencies in the Initial Report and the Review Group's investigation outlined above.

141.    Three days later, on May 3, 2018, W&C sent a letter to Lead Plaintiff stating that "[i]t has come to our attention that you recently filed a shareholder derivative complaint on behalf of Dr. Scott King." The letter also advised that "[t]he Review Group hopes to complete its review within 30 days." A copy of the May 3, 2018 letter is attached hereto as Exhibit 10.

142.    Almost two months later, on June 29, 2018, Fried Frank sent a letter to Lead Plaintiff's counsel "with regard to [the] January 8, 2018 [letter]." The June 29, 2018 letter claimed that the Review Group had completed a "supplemental investigation" in response to the January 8, 2018 letter and "issued a final report to the Board" (the "Supplemental Report"), which was enclosed with the letter. The June 29, 2018 letter further stated that:

The Review Group (i) found no evidence supporting the allegations set forth in your January 8, 2018 letter; and (ii) recommended that the Board decline to pursue claims against those whom you identified.

At a meeting held on June 29, 2018, a majority of disinterested and independent directors voted to adopt the findings and recommendations in the report.

A copy of the June 29, 2018 letter (including the Supplemental Report enclosed therewith) is attached hereto as Exhibit 11.  Neither the June 29, 2018 letter nor the Supplemental Report identified the directors who voted to approve the Review Group's findings or the circumstances under which the recommendation and vote took place.

143.    The Supplemental Report mischaracterizes Lead Plaintiff's January 8, 2018 letter (and March 2, 2018 follow-up letter) as a "Supplemental Demand Letter" that purportedly "raised new facts and allegations not asserted in [Lead Plaintiff's] Demand."  Supplemental Report at 3.[34] Far from being a "Supplemental Demand Letter," Lead Plaintiff's January 8, 2018 letter relied on facts and allegations in the Demand and/or information contained in the Initial Report in identifying deficiencies with the Review Group's investigation.  Accordingly, any news articles or other extrinsic sources cited in the January 8, 2018 letter were merely used to (1) corroborate information in the Demand and/or (2) debunk factual and legal findings contained in the Initial Report.  Furthermore, the Supplemental Report itself acknowledges that the January 8, 2018 letter "questioned the [Initial] Report's findings" and "focus[ed] on the Port Covington transaction"— *i.e.*, the very same transaction which is the focus of the Demand.  *Id.*

144.    The Review Group's "supplemental investigation" was, in sum and substance, an admission that the Review Group's initial investigation was inadequate.  Indeed, in connection with its "supplemental investigation," the Review Group's counsel purportedly reviewed a host of

---

[34] The Supplemental Report claims that the Board (which included Review Group members Bodenheimer and Olson) did not forward these letters to the Review Group (*i.e.*, Bodenheimer and Olson) until "March 2018."  *Id.*

documents which, as Lead Plaintiff noted in his January 8, 2018 letter, should have been included in the Review Group's initial investigation. *See id.* at 3-4. These documents included, among other things, (1) Board and Audit Committee meeting minutes and materials from 2012 to 2014; and (2) internal Sagamore documents. *See* Supplemental Report at 4. The Review Group's counsel also purportedly conducted several interviews which it plainly should have completed in connection with its initial investigation, including the interviews of Weller and defendant Coltharp. *See id.* at 4-5. Nonetheless, the Review Group's counsel still failed to interview key individuals such as S. Plank or collect and review documents from Plank Industries or Plank (in his personal capacity).

145.    The Supplemental Report also contains a number of findings that directly conflict with those contained in the Review Group's Initial Report. For example, after stating falsely in the Initial Report that Plank began acquiring parcels in Port Covington in 2014, the Supplemental Report finally acknowledged that Plank began these acquisitions in ***2012***. *See* Supplemental Report at 7. Moreover, after claiming incorrectly in the Initial Report that Port Covington "emerged as an attractive candidate" for the Company's corporate headquarters in ***2016*** ( *see* Initial Report at 11), the Supplemental Report acknowledged that the Company had decided to move to Port Covington much earlier than that (*see* Supplemental Report at 9-11). Indeed, the Supplemental Report acknowledges that: (1) "after the fall of 2014 . . . [Under Armour] focused on Port Covington and did not have other potential campus sites under active consideration" (*id.* at 9); (2) "by the fall of 2015, the Board was favorably inclined to pursue a purchase of the Port Covington properties" (*id.* at 10); and (3) in 2016, "the Company was not . . . actively investigating alternative proposals for purchase of a campus site . . . ." (*Id.*)

146.    The Supplemental Report raises more questions than it answers.  For example, despite suggesting in the Initial Report that the Port Covington Sale was governed by the Company's Policy on Transactions with Related Persons (*see* Initial Report at 8), the Supplemental Report now attributes a statement to Defendant Krongard that the Port Covington Sale was instead governed by a purported "tacit agreement" (*see* Supplemental Report at 9).   One of the purported terms of that "tacit agreement" was that "any acquisition price would be limited to the lesser of (1) fair market value or (2) a price where Plank would make *no profit* from the transaction[.]"  *Id.* (emphasis in original).   To the extent this tacit agreement ever existed at all, it was seemingly abandoned and/or violated, as the Supplemental Report states that Sagamore sought a profit on the Port Covington Sale consisting of a $4.5 million return on equity, $1.1 million in operating costs, and $1.2 million in overhead costs.  *Id.* at 10.

147.    In addition, while the Initial Report indicated that the negotiations between Under Armour and Sagamore focused on the purchase price for the Port Covington Sale (*see* Initial Report at 11), the Supplemental Report indicates that Under Armour and Sagamore's negotiations encompassed other matters such as (1) the assumption of "prospective environmental liabilities"; (2) "investment of tax-increment financing"; and (3) "possible other tenants in the non-[Under Armour] Port Covington parcels" (Supplemental Report at 11).   These disclosures raise serious questions about the full scope of the transaction(s) agreed upon by Under Armour and Plank in connection with the Port Covington Sale.

148.    Lastly, whereas the Initial Report stated that "th[e] purchase [for the Port Covington Sale] represented an approximate $1.5 million loss to Sagamore" (Initial Report at 11), the Supplemental Report now clarifies that this figure was calculated "***according to Sagamore leadership***," (Supplemental Report at 11) (emphasis added).   It is thus unclear whether the

Company and/or any representative(s) thereof ever determined whether the Port Covington Sale constituted a loss to Sagamore.

149.    The Supplemental Report also fails to address several lingering deficiencies from the Review Group's counsel's initial investigation.  The Supplemental Report again contains no appendices or exhibits to document how and on what basis the Review Group reached its conclusions.  Moreover, the Supplemental Report reveals that the Review Group's members once again played a perfunctory role in the "supplemental investigation," by (1) allowing W&C to review all documents and conduct all interviews, (2) meeting only twice "to discuss the status of the investigation," and (3) communicating "from time to time" with counsel.  Like the Initial Report, the Supplemental Report does not describe the substance of these meetings or the sporadic communications between the Review Group and its counsel.  Moreover, there is no indication that the Review Group members participated in *any* capacity in the drafting or review of the Supplemental Report.

150.    For the foregoing reasons, the Review Group's (1) investigation was not independent and lacked good faith and reasonableness, and (2) refusal of the Demand was wrongful.  The wrongful refusal of the Demand extends from the Review Group to the conflicted Board, which apparently rubber-stamped the recommendations contained in the Initial Report and Supplemental Report at the November 6, 2017 and June 29, 2018 Board meetings.  Because the Demand was wrongfully refused by the Review Group and the Board, Lead Plaintiff should be permitted to maintain this action on behalf of Under Armour.

## COUNT I

### Derivative Claim Against Plank for Breach of Duty in His Capacity as the Company's Controlling Stockholder

151.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

152.    In his capacity as Under Armour's controlling stockholder, Plank owed the Company the duties of the utmost due care, good faith and loyalty.

153.    Plank breached his duties and acted in bad faith by, among other things, using Company information to secretly acquire valuable real estate, usurping from Under Armour the opportunity to buy said real estate, and then demanding and causing the Company to enter into the unfair Port Covington Sale which benefited Plank at the expense of Under Armour.

154.    Plank also breached his fiduciary duties and acted in bad faith by, among other things, causing the Company to enter into the other unfair related-party transactions complained of herein.

155.    By reason of Plank's breaches of duties, the Company has sustained damages, as alleged herein.

## COUNT II

### Derivative Claim Against the Director Defendants for Breach of Fiduciary Duties

156.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

157.    As members of the Board, each of the Director Defendants owed the Company the duty to act (1) in good faith; (2) in a manner the director reasonably believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

158.     The Director Defendants, *inter alia*, (1) caused Under Armour to enter into the Port Covington Sale, and (2) repeatedly and knowingly failed to prevent, control or address Plank's related-party transactions that occurred at the expense of Under Armour, as alleged herein.

159.     By reason of the Director Defendants' breaches of duties, the Company has sustained damages, as alleged herein.

## COUNT III

### Derivative Claim for Aiding and Abetting Against Sagamore

160.     Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

161.     Because Plank controlled Sagamore, Sagamore was aware of the Board's duties in connection with the Port Covington Sale.

162.     Sagamore, in orchestrating the Port Covington Sale, knowingly aided and abetted Plank and the other Director Defendants in breaching their fiduciary duties.

163.     As a direct and proximate consequence of the foregoing, the Company has sustained damages, as alleged herein.

## COUNT IV

### Derivative Claim for Unjust Enrichment Against Plank and Sagamore

164.     Lead Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

165.     Plank and Sagamore have received an undue windfall in connection with the Port Covington Sale, which came at the direct expense of the Company and as a result of breaches of duties by the Company's directors and controlling stockholder.

166.     Plank and Sagamore will also receive an undue windfall in connection with their highly-profitable Port Covington project, the value of which will invariably increase as the

Company anchors the property with its headquarters.  The opportunity to acquire Port Covington real estate and the related appreciation in the land due to the Company's planned move were opportunities belonging to Under Armour that Plank and Sagamore improperly expropriated for themselves.

167.    It would be contrary to fundamental principles of justice, equity and good conscience for Plank and Sagamore to be permitted to retain this substantial and undue economic benefit.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff demands judgment as follows:

A.    Determining that this action is properly maintainable as a derivative action;

B.    Declaring that the Director Defendants have breached their duties as alleged herein;

C.    Declaring that Plank has breached his duties as a controlling stockholder as alleged herein;

D.    Declaring that Sagamore aided and abetted the Director Defendants' breach of their duties;

E.    Declaring that Plank and Sagamore have been unjustly enriched as alleged herein;

F.    Ordering Plank and Sagamore to disgorge the unlawful and improper benefits they have and will receive as a result of the unlawful scheme detailed herein;

G.    Requiring Defendants to pay the Company the amount by which it has been damaged or will be damaged due to the conduct complained of herein;

H.   Directing Under Armour to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with best practices with respect to related-party transactions, and to protect Under Armour and its stockholders from a recurrence of damaging events similar to those described herein;

I.   Awarding pre- and post-judgment interest on any award made to the Company;

J.   Awarding to Lead Plaintiff costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, and expenses; and

K.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: May 1, 2019

Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

**GOLDMAN & MINTON, P.C.**
Thomas J. Minton
Bar No.: 03370
3600 Clipper Mill Road, Suite 201
Baltimore, MD 21211
Tel: (410) 783-7575
Fax: (410) 783-1711
tminton@charmcitylegal.com

*/s/ Eric L. Zagar*
Eric L. Zagar *(admitted pro hac vice)*
Robin Winchester
Christopher M. Windover *(admitted pro hac vice)*
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 776-7056

*Liaison Counsel*

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
493 Bedford Center Road, Suite 2D
Bedford Hills, NY  10507
Telephone:  888-529-1108

*Lead Counsel*

*Of Counsel for Lead Plaintiff*

**VERIFICATION**

I, Scott King, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the Verified Consolidated Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATE:_____4/29/2019_____                    _____

                                                Scott King

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May, 2019, a copy of the foregoing Verified Consolidated Shareholder Derivative Complaint was served electronically via the Court's CM/ECF system on all counsel of record.

_/s/ Eric L. Zagar_____
Eric L. Zagar